Don SEATON, Plaintiff in Error,

v.

S. Joe TUCKER, Jr., Defendant in Error.

No. 37726.

Supreme Court of Oklahoma.

April 29, 1958.

Dyer, Powers & Gotcher, Tulsa, for plaintiff in error.

Chas. R. Gray, W. N. Palmer, Pawhuska, for defendant in error.

JOHNSON, Justice.

Parties will be referred to as they appeared in the trial court.

The record discloses that S. Joe Tucker, plaintiff, brought an action to recover from Glen Byron and Don Seaton for the pasturage of cattle. Plaintiff recovered judgment against both defendants for $1,000, the alleged balance due plaintiff at $20 per head for the pasturage of 100 big steers belonging to the defendant Seaton from April to October 1, 1955.

Defendant Seaton alone appeals from this judgment.

For reversal he interposes numerous assignments of error, briefed under propositions and sub-propositions, which we shall consider under the general query: "Is the judgment contrary to the law and the evidence?"

Seaton admits ownership of the 100 big steers known as "the Rafter Bar Steers," and that they were to be and were pastured by the plaintiff on his pastureland at so much per head from the first of April until the first of October, 1955. He contends, however, that he dealt only with Glen Byron as a sublessee of Byron, and that he had agreed with Byron to pay $15 per head for the pasturage of his 100 steers on the plaintiff's pastureland for the period in question and not $20 per head as contended by the plaintiff.

The record discloses there was no pastural lease on the plaintiff's land. The pastures were not rented by the acre, by the area or by pastures. The cattle were to be pastured by the plaintiff at so much per head. There being no lease, Seaton could not have been a sublessee.

It is not disputed that the deal was an oral, so much per head, pasture contract between the plaintiff and Glen Byron.

The discussion of the $15 a head arose because the original agreement between Byron and plaintiff was for the pasturage by plaintiff of 300 yearling steers at $15 a head. When the steers began to come in in April, 1955, they were all "big steers" instead of yearlings, and as soon as Byron returned from a trip he was on at the time plaintiff told him that they were big steers and did not comply with the agreement, and that he could not pasture the big steers for $15 a head. Then they ultimately agreed on $20 a head for the pasturage of the big steers.

There is no dispute in the evidence as to the agreement between plaintiff and Byron. Plaintiff was to be paid $20 a head for the pasturage of the cattle from the time they came in until they were removed not later than October 1, 1955.

It appears that Seaton at this point came into the picture in this manner: In late March he came up from Tulsa and was with Byron when they went to see plaintiff and with him looked over the pastures. On that occasion plaintiff asked Seaton if he represented Byron or the bank and Seaton said, "No, I'm just along for the ride."

Seaton did not dispute that testimony or offer to do so. That was one of the occasions when there was conversation between plaintiff and Byron as to the pasturage of the 300 yearling steers on Tucker's land at $15 a head.

When the big steers instead of the yearlings began to come in, Byron and plaintiff had further conversations. Byron testified that he told plaintiff that before agreeing definitely to the $20 a head he would call

his men. He testified that he did call them, and that he then agreed to pay $20 per head.

· Byron had at no time told plaintiff that he was obtaining pasture for Seaton or for anyone else, and plaintiff actually never knew that Seaton was a principal or owner of the 100 big steers known as the rafter bar steers for whom Byron was dealing until Seaton filed his answer and cross-petition wherein he stated that he was the owner of the rafter bar cattle.

When the agreement was reached be- .tween Byron and plaintiff to pay the $20 a head for the 300 steers, which included Seaton's cattle, Byron gave plaintiff a check for $3,000 to pay the first half of the pasture bill. It was drawn on the National .Bank of Commerce of Tulsa and dated April 15, 1955, signed by Byron, and payable. to plaintiff and contained the following notation: "For 1/2 pasture rental 300 Strs. Bal. to be paid when Strs. are taken out of pasture or not later than Oct. 1, 1955."

The evidence shows that this check was written on April 24, 1955. Byron dated it April 15, 1955, because that was the date the pasturage was to start and some of the steers had been delivered on that day. The check was paid by said bank on April 27, 1955.

On April 26, 1955, after Byron and plaintiff had had their conversation with reference to the delivery of the big steers instead of the yearlings, and after Byron had tentatively agreed to the $20 a head subject to calling his men and had then definitely· agreed to pay the $20 a head and had written the $3,000 check, Seaton called plaintiff over the telephone.

The substance of that telephone conversation was that Seaton was protesting against the price of $20 a head, and plaintiff told him that they were big steers instead of yearlings as had been agreed upon for the $15 a head, and Seaton said that the $20 was "just too damn high" and that he (Seaton) was going to stop payment on the $3,000 check that had been delivered to plaintiff by Byron. Plaintiff told him that his deal was with Byron,

and that the steers would stand good for the pasturage.

In that conversation Seaton did not say what his interest was in the cattle or give any explanation as to why he was calling in Byron's behalf. That conversation was on April 26, 1955, and the $3,000 check was paid on April 27, 1955.

This conversation was related by plaintiff on the witness stand, and Seaton did not deny it or any part of it or offer to do so.

Now, referring back to the trip Byron and Seaton made with plaintiff to look over the pasture in late March or early April, 1955, Byron testified: "Well, let me put it this way. I was waiting for the end of the ride to see if Mr. Seaton was satisfied with the pasture before I told Mr. Tucker (plaintiff) that we would take it." That is a statement that Byron made on the witness stand but which is not disclosed to have ever been made to the plaintiff, Mr. Tucker.

Byron also testified that he was not acting for himself in procuring the cattle. This also appears to be a statement made by Byron from the witness stand but which was never made to the plaintiff.

The record further discloses that the 100 rafter bar Seaton steers remained in the plaintiff's pastures almost the full time, that is, until September 24, 1955, when Seaton sent trucks for them with a representative who said he had a check to pay the balance of the pasture bill. After the cattle were loaded and had gone, the representative delayed in making payment and offered to pay only $5 a head instead of the $10 still owing and actually made no payment at all.

Ninety-nine head of rafter bar steers were delivered at that time. The 100th steer is still there.

Seaton testified that he owned the 100 rafter bar steers.

The total number of cattle delivered to plaintiff by Byron was 302. Besides the 100 Seaton rafter bar steers there were 202 branded "11." The 11 brand steers were called the Montgomery cattle. The full

payment of $20 a head was made on the 200 Montgomery cattle, except the last payment of $10 on one steer delivered later; however, the Montgomery cattle are not involved in this appeal.

This uncontroverted evidence clearly established that Seaton owned the 100 head of rafter bar cattle; that he looked over the pastures; that he knew the price had been changed to $20 because he had sent in big steers instead of yearlings; and that he protested the change and said that he would turn down the check which paid the first half of the pasture bill of $10 on his 100 head, but he did not and the check was paid; that he kept his cattle in the pastures from April to September 24, 1955, knowing that the price was $20 a head; that he knowingly received the full benefit of the agreement, and that he was Glen Byron's undisclosed principal.

■ Seaton admitted by his pleading (answer and cross-petition) that the contract for pasturing cattle between plaintiff (Tucker) and Byron inured to his benefit, and that admission binds him as a prinicpal. Edmonston v. Holder, 203 Okl. 189, 218 P.2d 905, and cited cases. See also 14 Okl. Dig., Trial, ■ for other cases.

The court did not err in overruling the defendant's demurrers and directing a verdict for the plaintiff and declaring an agister's lien against the Seaton cattle in favor of plaintiff.

■ There was no proof on the part of defendants to sustain their defense. We have said that where, under the pleadings, the plaintiff is entitled to recover, unless an affirmative defense pleaded by the defendant is sustained, and where no evidence is produced reasonably tending to support such defense, a verdict should be directed in favor of the plaintiff. Barnes v. Central State Bank, 207 Okl. 399, 250 P.2d 21.

Judgment affirmed.

WELCH, C. J., CORN, V. C. J., and HALLEY, WILLIAMS, JACKSON and CARLILE, JJ., concur.