C. H. CUTTS v. S. WORTH (WIRT) CASEY AND WIFE, MARTHA B. CASEY

No. 40

(Filed 14 April 1971)

1. Boundaries § 2— established line of another tract — fixed monument

A line of another tract which is well known and established on the ground is a fixed monument.

2. Boundaries § 2— discrepancy in distance called for in deed and that shown on map — factor for jury

Discrepancy between the length of ocean frontage called for in a grant and that shown on a surveyor's map of the property is a factor for the jury to consider in determining whether a disputed line of an adjoining tract, called for in the grant, has been correctly located, but once such line has been established, it controls course and distance.

3. **Rules of Civil Procedure §§ 41, 50— motion for dismissal — motion for directed verdict — sufficiency of claimant's evidence**

In nonjury trials the motion for nonsuit has been replaced by the motion for dismissal, G.S. 1A-1, Rule 41(b), and in jury trials by the motion for a directed verdict, G.S. 1A-1, Rule 50(a); the motion for a directed verdict presents substantially the same question formerly presented by the motion for nonsuit, that is, whether the evidence considered in the light most favorable to the claimant will justify a verdict in his favor.

4. **Trespass to Try Title § 2— title claimed by both parties — burden of proof**

In an action of trespass when both parties claim title to the land involved, and each seeks an adjudication that he is the owner and entitled to possession of the disputed property, each has the burden of establishing his title by one of the methods recognized by law.

5. **Ejectment § 7; Trespass to Try Title § 2— title claimed by both parties through common source — burden of proof**

Where both parties claim title to the disputed property through a common source, the burden rests upon each party to connect his title to the common source by an unbroken chain of conveyances and to show (1) that the disputed land is embraced within the bounds of the instruments upon which he relies and (2) that the title thus acquired is superior to that claimed by his adversary.

6. **Ejectment § 7; Trespass to Try Title § 2— fitting descriptions in chain of title to land claimed**

In an action involving title to land, claimant must show that the land he claims lies within the area described in each conveyance in his chain of title and, whether relying upon his deed as proof of title or color of title, must fit the description in his deed to the land claimed.

7. **Trespass to Try Title § 2— title claimed by both parties — failure of one party to carry burden of proof**

In an action of trespass wherein both parties claim title to the disputed land, a failure of one of the parties to carry his burden of proof on the issue of title does not, *ipso facto*, entitle the adverse party to an adjudication that title to the disputed land is in him, since he is not relieved of the burden of showing title in himself.

8. **Appeal and Error § 68— law of the case**

In this action of trespass wherein both parties claim title to the disputed land, decision on prior appeal that plaintiff's evidence was sufficient for the jury remains the law of the case in a subsequent trial upon substantially the same evidence, and defendants' motion for a directed verdict against plaintiff's action was properly denied.

9. **Trespass to Try Title § 4— insufficiency of evidence to show record title**

In this action of trespass in which plaintiff and defendants claim title to the land in controversy through an 1859 grant, and defendants claim title under an 1879 conveyance of a portion of that grant, the

location of the 1879 conveyance being in dispute, defendants' evidence was insufficient to establish record title to the land described in their answer where it failed to locate the 1879 conveyance on the ground by reference to the description in the deed which conveyed it.

**10. Boundaries § 13; Ejectment § 9; Evidence § 25— surveyor's map— inadmissibility as substantive evidence**

Surveyor's map purportedly showing the division of land conveyed by an 1879 deed was not admissible as substantive evidence of the location of the 1879 conveyance.

**11. Evidence § 25— private maps — admissibility**

Private maps may be used only when a witness testifies to their correctness from first-hand knowledge.

**12. Boundaries § 13; Ejectment § 9— failure to admit map for illustrative purposes — harmless error**

Where witnesses were questioned and gave answers with reference to a map offered by defendants, and defendants' claim would be impossible to visualize without the map, the trial court should have admitted the map for illustrative purposes; however, defendants were not prejudiced by its exclusion since the case was withdrawn from the jury, and the trial judge and appellate court have had the benefit of the map.

**13. Boundaries § 6— establishing line in senior grant — reversing call in junior grant**

A line created by a senior grant cannot be established by reversing the calls in a junior grant.

**14. Boundaries § 3— reversing calls**

Calls in a deed may be reversed only when the terminus of a call cannot be ascertained by running forward, but can be fixed with certainty by running reversely the next succeeding line.

**15. Adverse Possession § 5— continuity of possession — known and visible boundaries**

While adverse possession is not required to be unceasing, if it is interrupted, claimant must show that he has, from time to time, continuously subjected the land to the use of which it is susceptible for the statutory period—and such use must have been under known and visible lines and boundaries.

**16. Adverse Possession § 25— failure to show known and visible boundary**

Defendants failed to establish title to the land in controversy by twenty years' adverse possession on the part of defendants and their predecessors in title where they offered no evidence that any known or visible line marked the southeastern boundary of the land claimed by their predecessors in title.

**17. Trespass to Try Title § 5— issues submitted**

In this action of trespass to try title in which the location of an 1879 conveyance was in dispute, the trial court did not err when it

Cutts v. Casey

refused an issue tendered by defendant as to whether plaintiff owned the land described in the complaint and submitted issues as to whether the land described in the 1879 deed was properly located on a map introduced by plaintiff and, if it was, whether plaintiff was the owner and entitled to immediate possession of the land described in the complaint, since the first issue submitted by the court would determine whether plaintiff had title to the land described in the complaint.

18. **Trespass to Try Title § 5— failure to submit issues of trespass and damage — harmless error**

In an action of trespass to try title, the court's failure to submit issues of trespass and damage was harmless error where the jury answered the issue of title adversely to plaintiff.

19. **Rules of Civil Procedure § 50— directed verdict in favor of party having burden of proof**

The trial judge cannot direct a verdict under G.S. 1A-1, Rule 50, in favor of the party having the burden of proof when his right to recover depends upon the credibility of his witnesses, since it is the established policy of this State—declared in both the constitution and statutes—that the credibility of testimony is for the jury, not the court, and that a genuine issue of fact must be tried by a jury unless this right is waived. N. C. Constitution, Art. I § 19 (to become Art. I, § 25 on 1 July 1971) ; G.S. 1A-1, Rule 51(a).

20. **Rules of Civil Procedure § 41— unavailability of voluntary dismissal after plaintiff rests**

Under the new rules of civil procedure a plaintiff can no longer take a voluntary nonsuit as a matter of right or secure a voluntary dismissal *after* he has rested his case. G.S. 1A-1, Rule 41(a)(1).

21. **Rules of Civil Procedure §§ 41, 50— sufficiency of evidence — motion for directed verdict — motion for dismissal**

In a jury trial the motion for a directed verdict under Rule 50(a) is the only device by which the adverse party can challenge the sufficiency of the evidence to go to the jury; the comparable motion in a nonjury case is the defending party's motion for a dismissal under Rule 41(b).

22. **Rules of Civil Procedure § 50— directed verdict against plaintiff — judgment on the merits**

When a motion for a directed verdict under Rule 50(a) is granted, the defendant is entitled to a judgment on the merits unless the court permits a voluntary dismissal of the action under Rule 41(a)(2).

23. **Rules of Civil Procedure § 41— voluntary dismissal**

A dismissal under Rule 41(a)(2) is without prejudice unless the judge specifies otherwise.

**24. Rules of Civil Procedure § 50— directed verdict — absence of jury function**

The jury has no function when a directed verdict is ordered.

**25. Trespass to Try Title § 4— directed verdict for plaintiff — error by court**

In this action of trespass to try title, the trial court erred in directing a verdict in favor of plaintiff, the party having the burden of proof, and in assuming that plaintiff's evidence as to the location of a disputed line of an adjoining tract was uncontradicted.

Justice HUSKINS concurring in result.

APPEAL by defendants from *Cowper, J.,* February 1970 Civil Session of PENDER, certified for review by the Supreme Court before determination by the Court of Appeals upon the motion of both appellant and appellees. The appeal was docketed and argued at the Fall Term 1970 as Case No. 32.

*Blake and Trawick; Rountree & Clark for plaintiff appellee.*

*Corbett & Fisler for defendant appellants.*

SHARP, Justice.

This action of trespass to try title was before us at the Fall Term 1967, *Cutts v. Casey,* 271 N.C. 165, 155 S.E. 2d 519. It was here again at the Fall Term 1969, *Cutts v. Casey,* 275 N.C. 599, 170 S.E. 2d 598. Reference is made to these two decisions for the history of the case and a resume of the evidence in the first two trials.

The complaint alleges: Plaintiff is the owner of 2.8 acres in Topsail Township, Pender County, described by metes and bounds and designated as lot No. 3 on the map of the Division of Lands of Jesse W. Batson, recorded in Map Book 5, page 78. Defendants, asserting an invalid and unfounded claim to the land, have trespassed upon the lot and committed waste. Plaintiff prays that he be declared the owner, and entitled to the immediate possession, of the tract described in the complaint; that he recover $2,000.00 in damages; and that defendants be restrained from further trespasses.

Answering the complaint, defendants deny that they have trespassed upon any land belonging to plaintiff. They allege: Defendants are the owners of lot No. 1 of the Nancy Batts

Cutts v. Casey

subdivision of lot No. 3 of the Division of the Millie Bishop Estate, described by metes and bounds in paragraph 1 of the further answer and on the map recorded in Map Book 5, page 8. Plaintiff is trespassing upon the described land and, unless restrained, will cause defendants irreparable damage. Defendants and their predecessors in title have held, and adversely possessed, the property in suit under known and visible lines and boundaries for more than twenty years next preceding the institution of the action, and under color of title for more than seven years prior thereto. Defendants pray that they be declared the owners, and entitled to the immediate possession, of the lands described in the answer; that plaintiff be restrained from further trespassing upon the property; and that defendants recover $1,000.00 in damages from plaintiff.

At the third trial of this action the case was heard by Cowper, J., and a jury upon the transcript of the evidence offered by plaintiff and defendants before the referee in October 1965. The parties stipulated that the claim from a common source and specified the instruments through which each claims record title to the land in dispute.

The common source is land grant No. 1696, dated 20 April 1859, from the State to Jesse W. Batson for 51 acres adjoining Frederick Rhue on Topsail Banks: "Beginning at a stake, William B. Sidbury's corner on the sound; running thence with Sidbury's line across the Banks South twenty-five East sixty-six poles to a stake at the edge of the ocean; thence with the edge of the ocean North fifty-three East 107 poles (1765.5 feet) to Frederick Rhue's line; thence with Rhue's line North twenty-five West eighty-eight poles to a crooked creek; thence with the meanders of said creek to the beginning."

[1] The Batson grant describes a quadrangular-shaped tract lying between uncontroverted natural boundaries and between the boundaries of adjoining landowners, Rhue and Sidbury. The location of the Sidbury line is one of the crucial questions in this case. The location of the Rhue line, the northeast boundary of the Batson grant, is not in dispute. The Rhue line, which is the southwestern boundary of a grant of 114 acres on Topsail Banks from the State to Frederick Rhue, made on 18 November 1854, begins "at a stake at Cokle or Crooked Creek landing on the sound side, then South thirty-five East ninety-two poles to the Ocean. . . . " This line is well known and established on the

ground. As such it is a fixed monument. *Batson v. Bell*, 249 N.C. 718, 107 S.E. 2d 562. The parties stipulated that line A-B on the court map is the Rhue line and the third call of the Batson tract. This map, which is incorporated in this opinion, was made in December 1956 by J. W. Blanchard, Surveyor, to show the contentions of the parties.

As the first step in his effort to establish the location of the Sidbury line plaintiff introduced in evidence grant No. 1740, dated 4 January 1845, from the State to William B. Sidbury for 170 acres between Topsail Inlet and Stump Inlet. The description reads: "Beginning on a dead cedar at the east end of a hammock near Cockle Creek Pond; thence South twenty-three East fifty poles to a stake; thence South fifty West two hundred, sixty poles to a stake between the Hammock and the Atlantic; thence North twenty-three West one hundred and sixty poles to a stake in the sound; thence to the beginning."

Here we note that the northeastern line of the Sidbury grant (50 poles in length) does not run to the ocean. The southwestern line of the Batson grant runs the same course to the ocean and calls for 66 poles.

On 1 August 1879 J. W. Batson and wife conveyed to Millie Bishop a tract of land which, it is stipulated, is a portion of the land described in the Batson grant. The lot conveyed is described as "a certain tract of land in (Pender) County lying on Topsail Banks and adjoining the lands of Vashti Atkinson and bounded as follows, *viz.*: "Beginning at a stake, Vashti Atkinson's corner in the Sound; running thence with said Vashti Atkinson's line across the banks South twenty-five East sixty-six poles to a stake at the edge of the ocean; thence with the edge of the ocean North fifty-three East fifty-three poles (874.5 feet) to a stake; thence North twenty-five West eighty-eight poles to the sound; thence with the meanders of the sound back to the Beginning." Defendants claim title to the land in dispute under the deed from Batson to Bishop.

At this point we note that, although the first call in the deed from Batson to Bishop contains the same course and distance as the first call in the Batson grant, the beginning point is designated as Vashti Atkinson's corner, not William B. Sidbury's corner. It is also noted that the second call in the Bishop deed is for the same course, and approximately one half of the

distance, as the second call in the Batson grant. *Prima facie,* by this deed Bishop acquired about one half of the western portion of the Batson grant.

In a special proceeding instituted 21 January 1956 the heirs of Jesse W. Batson sought to partition the lands which he owned at the time of his death. Those lands are described in the petition as the 51 acres which Batson acquired by grant No. 1696, less the tract he conveyed to Millie Bishop on 1 August 1879 by deed recorded in Book D, page 514, Pender County Registry.

The commissioners appointed by the court to partition the Batson lands employed Raymond Price, Surveyor, to make the division. In May 1956 he purported to survey the William B. Sidbury grant. His location of Sidbury's northeast line is shown as the line A-E on the map introduced in evidence as plaintiff's Exhibit F. This map is made a part of this opinion. The southwestern boundary of the Batson grant and of the Millie Bishop tract is shown as that same line A-E extended to B. The Rhue line is shown as the line C-D.

Having located the Sidbury line to his satisfaction, in order to define the Batson grant, Price measured from his Sidbury line along the edge of the ocean to the Rhue line. This distance turned out to be 209 poles (3,448.5 feet) instead of 107 poles (1,765.5 feet) as called for in the grant. On the premise that the Vashti Atkinson line was the northeastern line of the Sidbury grant, Price next defined the Millie Bishop tract by running the calls in the deed from Batson to Bishop. He extended the Sidbury line A-E (53 poles) to point B to make the 66 poles (1,089 feet) specified in the first call. From B he ran 53 poles (874.5 feet) along the edge of the ocean; thence N. 25° W. 88 poles to Topsail Sound. Having located the Bishop tract at the southwestern end of the Batson grant, Price then divided the remaining 2,574 feet of ocean frontage into 12 lots of varying widths extending from the ocean to Topsail Sound as shown on Exhibit F. In that division, lot No. 3 was allotted to the heirs of Levi Batson, who conveyed that lot to plaintiff Cutts on 6 October 1964.

[2] We here note that Price, by his location of the Sidbury line, almost doubled the distance of ocean frontage called for in the Batson grant. Such a discrepancy in distance is a factor for the jury to consider in determining whether a disputed line

of another tract has been correctly located. Once it is established, however, "such line 'controls course and distance, being considered the more certain description and it makes no difference whether it is a marked or unmarked, or mathematical line, . . . *provided it be the line which is called for.*'" *Coffey v. Greer,* 241 N.C. 744, 746, 86 S.E. 2d 441, 443.

Plaintiff claims record title to the land in dispute through the following instruments: The Batson grant; special proceeding partitioning the lands of Jesse W. Batson, deceased; deed from the heirs of Levi Batson to plaintiff.

The deed from Batson to Bishop is the source of defendants' claim, and they contend that it conveyed a tract located at the northeastern end of the Batson grant, and that the northeast boundary of the Bishop tract is the Rhue line.

In December 1946, on the basis of a survey and map made by R. E. Koonce, Engineer, the heirs of Millie Bishop purported to divide the lands conveyed to her by Batson into six lots, each fronting 159.3 feet on the ocean (a total of 955.8 feet, 81.3 feet more than called for in the Bishop deed) and running back to Topsail Sound. The Koonce division was made on the assumption that the Rhue line was the northeastern line of the Bishop tract, and his map shows that he began his survey at the iron pipe which is the Rhue corner on Cockle Creek and from there ran S. 32° E. 1000 feet to the Atlantic Ocean; thence with the ocean S. 57° 30' W. to a stake; thence N. 70° W. 1871 feet to Topsail Sound; thence with the sound to the beginning.

The map of the Millie Bishop division is recorded in Map Book 3, page 36, Pender County Registry. It was frequently referred to in the testimony, and the parties stipulated that the iron pipe shown on the Koonce map is the Frederick Rhue corner. Defendant S. W. Casey was permitted to testify that the lot described in the answer was included within the boundaries of lot No. 3 as shown on the Koonce map; that he was with Surveyor Blanchard when he sub-divided lot No. 3 of the Koonce division. Without this map any comprehension of defendants' claim is impossible. However, plaintiff's objection to its introduction in evidence was sustained. For illustrative purposes, however, it is incorporated in this opinion.

On 4 March 1947 by a deed, which recites that the grantors and grantees are all of the heirs of Millie Bishop, the following

described lands were purportedly conveyed to Mrs. Nancy I. Batts, Thelma Batts, Norman Batts, and J. P. Batts:

"BEGINNING at the corner of Lot #2 on the Atlantic Ocean at the low water mark, thence with said low water line South 57° 30′ West 159.3 feet to the corner of Lot #4; thence with the line of said Lot North 52° 30′ West 1540 feet crossing Cockle Creek and the Highway to the Sound; thence with the Sound to the corner of Lot #2; thence with the line of said Lot South 46° 15′ East 1550 feet to the Beginning, containing 8.9 acres, being Lot #3 of Millie Bishop Division. . . . "

Thereafter, in June 1954, W. W. Blanchard, Surveyor, basing his work entirely on the Koonce survey, subdivided lot No. 3 described above into three lots. In 1956 Norman Batts, Thelma Batts, the widow of J. P. Batts, and Nancy Batts conveyed lot No. 1 of the subdivision of lot No. 3 to defendant Martha B. Casey. Lot No. 1 fronts 57.23 feet on the ocean and is the southernmost lot in the subdivision of lot No. 3. It is the land described in the answer and shown on the court map within the lines 1-5-2, 2-3, 3-6-4, 4-1.

Defendants claim record title to the land in suit through the following instruments: The Batson grant, deed from Batson to Millie Bishop, deed from the heirs of Millie Bishop to Batts, and deed from Batts to defendant Martha B. Casey.

From the foregoing recital it is apparent that two surveyors have located the Millie Bishop tract at different places and have plotted overlapping subdivisions.

Price testified that he laid the Batson subdivision "right on top" of Koonce's Millie Bishop division, which "looked like a turkey gobbler's tail." The court map shows that the northern portion of the lot described in defendants' answer overlaps a portion of the northern third of the lot described in plaintiff's complaint. This lappage, the land in suit, is shown on the court maps as a quadrangle about 80 X 280 X 180 X 80 between the lines 2-3, 3-6, 6-5, 5-2. Plaintiff contends that all the land which Price subdivided was entirely outside and east of the boundaries of the Millie Bishop tract. Defendant contends that the land which Koonce subdivided was entirely within the boundaries of the Millie Bishop tract, the northeast line of which was the Rhue line. Thus, it is clear that neither party can establish his title to the land in suit without first locating the Bishop tract.

To establish point A on the Price map as the site of the dead cedar and the beginning point in the first call of the Sidbury grant, plaintiff offered the testimony of Bruce King, Homer King, and Amos Howard.

Bruce King, aged 47, the great, great grandson of William B. Sidbury, the great grandson of Vashti Atkinson and the grandson of Mary E. King, testified: About 35 years ago, at a time when there was no dispute about the location of the northeast line of the Sidbury grant, his father (A. W. King) showed that line to him. He pointed out the dead cedar as the beginning point of the William B. Sidbury grant. On that occasion his father was cutting fence posts on the Sidbury grant, and he showed the line to his crew so that they would not cut over it. At that time his father's mother, Mary E. King, the daughter of Vashti Atkinson, owned the land west of that line. However, she sold it before she died. Bruce King last saw the cedar seven or eight years ago. It is now gone and a lightwood knot or stake, which he pointed out to Price, is located at the beginning point. This stake is about 300 feet from the east end of Horse Hammock and 50-75 yards from a partly filled pond. About 300 feet from the stake "eastward toward the ocean," not quite half-way between the stake at point A and the ocean, there is a cedar snag which was once a tree. King's father said that the line ran almost directly by this snag. Bruce King also testified that there was another Amos Atkinson tract "up the beach" north of the Rhue tract which had "nothing to do with the tract we are talking about."

Homer King, aged 51 and the brother of Bruce King, testified that his father, A. W. King, never showed him "the direct corner" of the Sidbury grant. However, over 35 years ago, when Homer was just a young lad and there was no controversy about the line, his father pointed out "this cedar snag that was up near the end of the hammock" and said that the Sidbury line was between it and Cockle Creek Pond, which was at the end of the hammock. This was the occasion when A. W. King was cutting fence posts, and he told the men to stay below that cedar snag because that was right near the William Sidbury corner. A. W. King never owned any land on either side of the Sidbury line.

Amos Howard, aged 79, testified: He had been familiar with Topsail Beach for 65 years or more. Sixty years ago, when

there was no dispute about the William B. Sidbury line and "nobody didn't care much about it," several people had showed him the line which is now in dispute. Two of Sidbury's great grandsons (the King boys' father and uncle), a fisherman named Blake, and others told him that the Sidbury line, the Vashti Atkinson line, and the Mary E. King line were the same. "They would just talk about it and that's all. This dispute came up in later years, long since then." As a boy he fished at the northern end of Cockle Creek, and nothing was said for a long time. After a while when some of the Batsons demanded rent for the beach they just moved off to where a man gave them permission to fish. The Sidbury line began at a stake out in the marsh at the end of Horse Hammock. He showed this line to Price and went with him to this stake. From it the line ran straight to the ocean on a course parallel with the Rhue line which ran from Cockle Creek to the ocean. When he used to land at Cockle Creek Landing and go to parties at Cockle Creek "it wasn't known as the Millie Bishop land, it wasn't even known whose land it was, that was before I was grown, it weren't even considered, people didn't consider where they were at, whose land they were on, anything of the kind at that time."

Price testified: In surveying the Sidbury and Batson grants he began at an old lightwood knot which Bruce King, Amos Howard, and a number of others pointed out to him as the site of the old cedar. There was a "marshy place" east of this point, "a wet place that could be considered a pond." The stake in the marsh was approximately 300 feet from the end of the hammock. He ran the calls from the lightwood knot, and he is certain he found the correct geographical point. On the southeastern line of the Sidbury tract, line F-G on Exhibit F, he found marked trees. On the Batson survey when he reached the ocean at point B he "went the distance between two fixed points on the ground." He increased the distance from 107 to 209 poles because he was thoroughly convinced of the location of the William B. Sidbury and Rhue lines for which the grant called, and he merely showed the distance between the two lines, A-E-B and C-D.

Plaintiff's evidence further tended to show: William B. Sidbury died prior to March 1861. His daughter Vashti had married Amos Atkinson and was the only wife he ever had.

William B. Sidbury had "quite a number of pieces of land," some of which lay north of the Rhue grant. His old homeplace was part of a grant on the mainland. In March 1861 the lands of William B. Sidbury, including the 170 acres described in grant No. 1740, were partitioned by special proceeding. The commissioners allotted "to Amos Atkinson and wife" three tracts totaling 239 acres. One "tract of banks land," containing 55 acres, was described as "Beginning on a dead cedar, running So. 23 E. 125 poles to a stake; thence No. 23 W. 100 poles to a stake in the Sound; thence to the beginning." Obviously this purported description does not close. The first and second calls are the same line in reverse, the second running back on the first for a disance of "100 poles to a stake in the Sound." It seems likely that this second call was, in reality, the third call and that the second call was omitted. But, however that may be, plaintiff contends that the first call is for the northeastern line of the Sidbury grant No. 1740.

Defendants' evidence tended to show: W. H. Utley, an admitted expert in survey and forestry, purported to survey the Sidbury and Batson grants in 1957 after consulting with three elderly residents of the community, Daniel Justice, aged 80, Raleigh Clayton, aged 78, and Roland Batts, aged 60. Clayton and Justice are now dead. A map of his survey was introduced in evidence as defendants' Exhibit 12, and is incorporated in this opinion. Mr. Justice pointed out to Utley the stake at Cockle (Cokel or Crooked Creek) Landing, which marks the beginning point of the Rhue grant. From this point Utley ran the first call in the Rhue grant to the ocean, line D-E on his map, line A-B on the court map, and line C-D on the Price map, Exhibit F. Mr. Justice took Utley to the end of a hammock just west of the pond which terminates at Crooked or Cockle Creek and, as far as these elderly gentlemen could recall, the end of the hammock and pond "existed today as it always had." They did not refer to this hammock as Horse Hammock, and the Sidbury grant does not cite Horse Hammock as the point of beginning.

Opposite the end of the hammock, just above the level of the existing marsh and just west of the pond which terminated at Crooked or Cokel Creek, Utley found an old cedar stump, which was approximately three feet across the collar. In the immediate vicinity were a number of cedar stumps of varying sizes. The location of this cedar stump is shown as point A on

Cutts v. Casey

Utley's map, and his line A-B-C crosses the east end of the hammock at a higher elevation than the surrounding area. The cedar stump at point A was not pointed out to Utley as a particular landmark, and neither Justice, Clayton, nor Batts identified it as the beginning point of the Batson or Sidbury grants. However, its location at the east end of a hammock 75 feet from Cockle Creek Pond fits the description in the Sidbury grant and, after exploring the area, Utley was of the opinion that this stump at point A was the only possible beginning point of the Sidbury and Batson grants.

From point A he ran the first call in the Batson grant, shown as line A-B-C on Exhibit 12. He could not run to point C, which is in the Atlantic Ocean; so that point was computed. He found no particular landmarks on line A-B-C. Measuring from that line to the Rhue line, D-E, he found the distance to be 1,912 feet, or approximately 116 poles. After locating the cedar stump, Utley also attempted to lay the Sidbury grant on the ground by beginning at point A, and running to the ocean. However, at point B, "50 poles or 812 feet from the beginning," he established a point from which he turned to run line B-F, the second call in the Sidbury grant. From F he ran line F-G, the third call (taking into consideration the appropriate variation) across the hammock to the edge of the sound. The terminus, point G, was under water. This survey fitted the landmarks and, in Utley's opinion, shows the true location of the Sidbury grant.

On Utley's map, point 1 is the same as point A on the Price map, and Utley's line 1-2 is shown on the Price map as line A-E. At point 1, which is in the salt marsh, he found a large cedar limb. He pulled it up and examined the tip. It bore tool marks which Utley believed to be from six to twelve months old. The marsh grass at the bottom of the hole had not deteriorated and, in his opinion, it was the previous year's growth. He found no trees or stumps within a radius of 30 feet from the cedar limb. In running line 1-2 he found no marked trees, but someone had cut a visible path through there with a bush axe "within a year or so." Immediately to the northeast of line 1-2 the hammock narrows to a waist at a point about 2,000 feet from the southwestern edge of Cokel Creek Pond.

Utley made no attempt to survey the Millie Bishop deed. All he knows about that is what he saw on the Millie Bishop division map. Mr. Justice told him while standing near the Rhue

corner on Cockle Creek that the land to his right had always been known to him as the Millie Bishop land, but he did not know the present owner. Utley concedes that his survey depends on what the three elderly gentlemen told him plus the location of the old cedar stump.

Defendants offered the evidence of Mrs. Edna Bishop Norman, a great granddaughter of Millie Bishop, and Mrs. Norman's two brothers, O. H. Bishop and L. W. Bishop. They testified that their father, who had been dead approximately thirty years, told them that the Millie Bishop land adjoined the Rhue grant, and that the common line was the Rhue boundary which began at an iron stake on Cockle Creek Landing and ran from there to the ocean. Mrs. Norman testified that her father had looked after the entire interest of all the other heirs when she was just a child; that it was an undivided interest; that they used it for cattle and hogs and "there were fishermen over there, but (she) couldn't say where. . . . " L. W. Bishop testified that for the past 45 years they had hogs and cattle on the Bishop lands; that since the division he had borrowed some money on his part; that both Mr. Justice and Roy Batts had told him the Bishop and Rhue lines begin at Cockle Creek. O. H. Bishop testified: During the past forty years they had used the Bishop lands for grazing purposes. When they were kids he would go with his father to tend the hogs at Cockle Creek Landing. His father would point "this way," not exactly toward Topsail but "toward the ocean and down the sound, more to the south," and tell them, "This is our land." His father used the landing "to go call up the hogs," and "everybody put it on the beach that owned land." Prior to the institution of this lawsuit he had never heard of the Batsons having any connection with this land. He had attempted to build a cottage on the lot but "storm Hazel whipped it away."

S. W. Casey, the husband of defendant Martha Casey, testified that on 27 July 1956 (the date of the institution of this action) he had a building started on the lot described in the answer; that during 1947 Nancy I. Batts and others leased lot No. 3 of the Millie Bishop Estate to the U. S. Navy; and that the land described in the answer is a part of that lot. The documentary evidence showed that the lease was executed on 30 June 1946 and terminated on 15 August 1948. There was no evidence as to what use, if any, the Navy made of this land.

Leroy O. Batts, Sr., testified: He was familiar with the Millie Bishop lands. They adjoined the Rhue grant, the common line beginning at an iron stake at Cockle Creek Landing and going to the ocean. His father had pointed out this line to him 55 years ago. Batts did not know what use the Millie Bishop heirs had made of the land since the subdivision; prior thereto they had cattle and hogs on it as well as a fishery. Before this dispute arose he had never heard that Jesse Batson or his heirs owned any land adjoining Rhue's. R. D. Everett, a resident of the vicinity, testified that the Bishop land "is located south with reference to Cockle Creek Landing"; that his deceased uncle, Oswell Bishop, had pointed the land out to him forty years ago.

At the close of plantiff's evidence, and again at the close of all the evidence, defendants moved for a directed verdict. Both motions were denied and defendants excepted. The record does not disclose that defendants stated the specific grounds for either motion. At the conclusion of all the evidence plaintiff, without stating the specific grounds for his motion, moved for a directed verdict against the defendants on their cross action. This motion was allowed and defendants excepted.

Defendants tendered issues whether (1) plaintiff owned the land described in the complaint; (2) whether defendants had trespassed upon those lands; (3) what damages, if any, plaintiff was entitled to recover; (4) whether they owned the lands described in the answer, and (5) what damages, if any, defendants were entitled to recover of plaintiff. The court refused these issues and submitted the following:

"1. Is the Millie Bishop land described in the deed from Jesse W. Batson, the land as indicated on Plaintiff's Exhibit 'F', the Price Map under the legend J. W. Batson and wife, to Millie Bishop, 1879?

"2. If you answer the first issue 'Yes' is the Plaintiff the owner and entitled to the immediate possession of the lands described in the Complaint, Lot #3, on Plaintiff's Exhibit 'F', the Price Map?"

The jury answered the first issue "No" and, in consequence, did not answer the second issue. Thereupon plaintiff moved for a judgment notwithstanding the verdict. This motion was not coupled with a motion for a new trial, nor was a new trial prayed for in the alternative.

Cutts v. Casey

Contending that the court had erred in its ruling upon certain evidence and in its charge, defendants filed motions to set aside the directed verdict which Judge Cowper had entered against them on their cross action and for a new trial. These motions were denied. Defendants then tendered a judgment upon the verdict, which decreed that plaintiff was not the owner of the land described in the complaint and incorporated the court's ruling "nonsuiting" defendants' cross action.

Judge Cowper declined to sign the tendered judgment. Instead he entered judgment which recited (1) that his ruling allowing plaintiff's motion for a directed verdict against defendants' cross action should stand "inasmuch as the defendants have failed to prove title to any land and locate such land within the Jesse W. Batson grant and within the lands conveyed by Jesse W. Batson and wife to Millie Bishop"; (2) that plaintiff's motion for judgment notwithstanding the verdict should be allowed "inasmuch as plaintiff has proved without contradiction that he is the owner of the lands described in the complaint, as shown on the division map of the lands of Jesse W. Batson, deceased, . . . by conveyance from the proper heirs of Jesse W. Batson without any lappage or infringement on such lands by lands owned by the defendants; and (3) that the defendants' motion for a new trial should be overruled."

The judgment decreed that defendants are not the owners of the lands described in the answer; that plaintiff is the owner and entitled to the immediate possession of the land described in the complaint; that defendants' claim to the lands described in the answer is a cloud upon plaintiff's title to the lands described in the complaint which should be, and is, hereby removed; and that "plaintiff be and he is hereby allowed to recover against the defendants nominal damages and the costs."

The first assignment of error which defendants bring forward is that the court erred in denying their "motion for a directed verdict of nonsuit" at the conclusion of plaintiff's evidence and at the close of all the evidence. The second is that the court erred in allowing plaintiff's "motion for nonsuit" as to defendants' cross action.

**Cutts v. Casey**

Cutts v. Casey

MAP

SHOWING THE DIVISION OF THE
WILLIS BISHOP ESTATE SITUATED
IN PENDER CO., N.C. BETWEEN
THE ONSLOW-PENDER LINE OF
TOPSAIL INLET. SURVEYED DEC.
1946 BY R.E. HOOKS ENGINEER.

Def. Ex. #3

Cutts v. Casey

Cutts v. Casey

**[3]** When the new rules of Civil Procedure became effective on 1 January 1970, the word *nonsuit* was banished from our civil practice. In nonjury trials the motion for nonsuit has been replaced by the motion for a dismissal, G.S. 1A-1, Rule 41(b); in jury trials, by the motion for a directed verdict, G.S. 1A-1, Rule 50(a). The motion for a directed verdict presents substantially the same question formerly presented by the motion for nonsuit, that is, whether the evidence considered in the light most favorable to the claimant will justify a verdict in his favor. *Kelly v. Harvester Co.*, 278 N.C. 153, 179 S.E. 2d 396.

**[4-6]** In an action of trespass when both parties claim title to the land involved, and each seeks an adjudication that he is the owner and entitled to the possession of the disputed property, each has the burden of establishing his title by one of the methods specified in *Mobley v. Griffin*, 104 N.C. 112, 10 S.E. 142; *Day v. Godwin* and *Day v. Paper Co.* and *Day v. Blanchard*, 258 N.C. 465, 128 S.E. 814. Where, as here, the parties claim through a common source, the burden on the issue of title rests upon the "party asserting title and right of possession to connect his title to the common source of title by an unbroken chain of conveyances and show that (1) the land in controversy is embraced within the bounds of the deeds or other instruments upon which he relies, and (2) the title thus acquired is superior to that claimed by his adversary." *Jones v. Percy*, 237 N.C. 239, 242, 74 S.E. 2d 700, 702. Claimant must show that the land he claims lies "within the area described in each conveyance in his chain of title and he must fit the description contained in his deed to the land claimed." *Cutts v. Casey*, 271 N.C. 165, 167, 155 S.E. 2d 519, 521. Whether relying upon his deed as proof of title or color of title a claimant is required to fit the description therein to the earth's surface. *Day v. Godwin, supra;* *Seawell v. Fishing Club*, 249 N.C. 402, 106 S.E. 2d 486; *Skipper v. Yow*, 238 N.C. 659, 78 S.E. 2d 600.

**[7]** A failure of one of the parties to carry his burden of proof on the issue of title does not, *ipso facto*, entitle the adverse party to an adjudication that title to the disputed land is in him. He is not relieved of the burden of showing title in himself. *Moore v. Miller*, 179 N.C. 396, 102 S.E. 627. "The plaintiff must recover on the strength of his own title, and upon failure of proof by him the jury may well find that he is not the owner of the land, although satisfied that the defendant has no title." *Wicker*

*v. Jones,* 159 N.C. 103, 116, 74 S.E. 801, 806. This statement is, of course, equally applicable to a defendant who has set up a cross action in which he claims title to the land in dispute. Thus, in this case, if defendants fail to locate the Millie Bishop tract according to their contentions, title cannot be adjudicated in plaintiff merely because of defendants' failure of proof. The burden remains upon plaintiff to prove his title. There are cases involving a disputed title to land in which neither party can carry the burden of proof.

[8] Plaintiff's evidence, when considered in the light most favorable to him, was sufficient to establish the northeastern line of the Sidbury grant as line A-E on the Price map, the southwestern line of the Batson grant as the line A-E-B, the Vashti Atkinson line as line A-E, and the Bishop tract as depicted on the Price map. Thus, plaintiff's evidence would justify a finding that the land he claims lies within the Batson grant and outside the Millie Bishop tract. Each of the three trials which has come to this court for review was had upon the transcript of the evidence taken before the referee. Although certain evidence admitted in the second trial was excluded in the third, plaintiff's evidence has not varied materially from that of the first trial at which the trial judge entered judgment of nonsuit at the close of his evidence. Upon appeal, in an opinion by Chief Justice Parker, we reversed the nonsuit. *Cutts v. Casey,* 271 N.C. 165, 155 S.E. 2d 519. That decision remains the law of this case. Defendants' motion for a directed verdict against plaintiff's action was properly denied.

The next question is whether plaintiff's motion for a directed verdict against defendants' cross action was properly allowed. Defendants contend that they not only located the Millie Bishop tract according to their record title at the northeast end of the Batson grant, but also that they showed adverse possession of the lot described in the answer for a period of more than thirty-five years. Neither of these contentions can be sustained.

[9] Defendants assert record title to the land in suit under the deed from Batson to Bishop. They stipulate that Batson acquired the land he conveyed to Bishop by a grant from the State. This grant described a tract at least twice as large as the tract described in his deed to Bishop. Notwithstanding, defendants made no effort to locate the Millie Bishop tract on the ground by reference to the description in her deed. Although

that description begins at "Vashti Atkinson's corner in the Sound," and runs thence with her line "across the banks" S. 25° E. 66 poles to the ocean, defendants offered no evidence tending to locate either her corner or her line. Defendants' contention that they "made out a prima facie case of their counterclaim" by showing that the lot described in the answer was contained within the description of the deed from Batson to Bell and "within the Millie Bishop Estate Division Map" is indeed perplexing. However, it seems that by some thaumaturgy they would substitute for Millie Bishop's 1879 deed the Koonce map made in 1946 at the instance of her great grandchildren, who were then desirous of dividing her beach property among themselves. This, of course, they cannot do.

[10-12] Indubitably the Koonce map was not admissible as substantive evidence to locate the Millie Bishop tract. *Barnes v. Highway Commission,* 250 N.C. 378, 109 S.E. 2d 219; *McCormick v. Smith,* 246 N.C. 425, 98 S.E. 2d 448; *Memory v. Wells,* 242 N.C. 277, 87 S.E. 2d 497; *Bullard v. Hollingsworth,* 140 N.C. 634, 53 S.E. 441; *Burwell v. Sneed,* 104 N.C. 118, 10 S.E. 152; *Dobson v. Whisenhant,* 101 N.C. 645, 8 S.E. 126. Further, "private maps may be used only when a witness testifies to their correctness from first-hand knowledge." Stansbury, North Carolina Evidence § 153 (2d Ed. 1963) ; 32 C. J. S. *Evidence,* § 730(1) (1964). No person attested the accuracy of the Koonce map or attempted to fit it to the description in the Bishop deed. It was, therefore, nothing more than a written declaration by Koonce as to the boundaries of a tract belonging to the "Millie Bishop estate." *Cowles v. Lovin,* 135 N.C. 488, 47 S.E. 610. However, witnesses were questioned and gave answers with reference to the Koonce map. Further, without this map, it would be impossible to visualize defendants' claim. Under these circumstances the court should have admitted the map, carefully limiting its use for illustrative purposes. However, since the case was withdrawn from the jury, and the trial judge and this court have had the benefit of the map, no possible prejudice resulted to defendants from its exclusion. Defendants' assignment of error based upon its exclusion is overruled.

Koonce's assumption that the southwest corner of the Rhue grant was the northeast corner of the Bishop tract gets no support from the Bishop deed. Defendants' evidence tends to show that Mr. Justice told Utley that the land lying southwest of the Rhue line "had always been known to him as Bishop land." R. D.

Everett testified that the Batson lands were located south of Cockle Creek Landing. Several of the Bishop heirs who participated in the Koonce division of her lands testified that their deceased father, at a time when he was a tenant in common of the lands, told them the Rhue land was the Bishop line. However, there is no testimony in the record tending to show that any call in the Bishop deed was a call for the Rhue line. Since the third call in the Bishop deed is the one line identified only by course and distance—the first being the Atkinson line; the second, the Atlantic Ocean; the fourth, the sound—*if* Koonce was attempting to locate the Bishop tract by the deed he was treating the Rhue line as the third call.

[13, 14] From the Rhue line Koonce went southwesterly with the ocean 955.8 feet to a point—not 874.5 feet as specified in the Bishop deed. From that point he ran N. 70° W. 1871 feet to the sound. According to the description in the Millie Bishop deed this line would have been the Vashti Atkinson line, but neither documentary nor oral evidence so identified it. Further, the evidence tended to show that, applying the rules of surveying, in 1946 the call 70° W. could not conform to 25° W. as of 1879. This latter course is the third call in the Bishop deed and the first call in reverse. In any event, Vashti Atkinson's line, having been created by a senior grant, could not be established by reversing the calls in the Bishop deed, a junior grant. "Before the calls of the junior grant can be ascertained, those of the elder must be located and recourse cannot be had to the junior grant for that purpose." *Cornelison v. Hammond*, 224 N.C. 757, 759, 32 S.E. 2d 326, 327; *Day v. Godwin* and *Day v. Paper Co.* and *Day v. Blanchard, supra*. Further, reversing may be had only when the terminus of a call cannot be ascertained by running forward, but can be fixed with certainty by running reversely the next succeeding line. *Locklear v. Oxendine*, 233 N.C. 710, 65 S.E. 2d 673; *Jarvis v. Swain*, 173 N.C. 9, 91 S.E. 358. Patently this is not a case for reversing.

As earlier pointed out, the first call in the Bishop deed is for the same course and distance as the first call in the Batson grant, its southwest boundary. The only difference is that, instead of calling for the corner of William B. Sidbury (then deceased), it calls for the corner of his daughter Vashti Atkinson. The deed's second call runs northeast with the ocean 53 poles to a *stake*. The third call, which is parallel with the first, runs N. 25° W. 88 poles to the sound, and the fourth runs with the

sound back to the beginning. It is significant that the terminus of the second call in the Bishop deed is a stake—*not the Rhue line*—and that Vashti Atkinson was the only adjoining landowner to whom the description refers. *Prima facie,* the third call, which began at a stake in the edge of the ocean and ran northwesterly to the sound, was a new line going through the Batson grant. As Price—the only surveyor who purported to locate the Bishop tract—testified, wherever the Sidbury line may be located on the ground, the deed from Batson to Millie Bishop locates the Bishop tract at the southwest end of the Batson grant and not the northeast end, as defendants contend.

Utley, the surveyor who testified for defendants, said that he did not survey the Millie Bishop tract and that all he knew about it was what he saw on the Koonce map.

[9, 16] From the foregoing discussion it is quite clear that defendants failed to show that the land described in the answer is covered by the description in the Millie Bishop deed. Furthermore, a reference to the testimony of the Batson heirs and other witnesses for defendants make it equally plain that defendants have failed to establish title by twenty years' adverse possession. The character and requirements for such possession have been stated many times. *State v. Johnson,* 278 N.C. 126, 179 S.E. 2d 371; *Everett v. Sanderson,* 238 N.C. 564, 78 S.E. 408; *Price v. Whisnant,* 236 N.C. 381, 72 S.E. 2d 851; *Locklear v. Oxendine, supra; Smith v. Fite,* 92 N.C. 319. *See* 1 N. C. Index 2nd *Adverse Possession* §§ 1 *et seq.* (1967).

The land which defendants claim as the Bishop tract was unfenced. Cattle and hogs belonging to others also roamed the banks adjacent to Cockle Creek Landing. If there was a "fishery" on the lands its location and duration were not disclosed. This comment is equally applicable to defendants' other evidence of possession. Further, the lease to the Navy and the beginning in 1956 of a house on the lot described in the answer are patently insufficient to establish title by adverse possession to the land in dispute.

[15, 16] While adverse possession is not required to be unceasing, if it is interrupted, claimant must show that he has, from time to time, continuously subjected the land to the use of which it is susceptible for the statutory period—and such use must have been under known and visible lines and boundaries. Assuming the notoriety of the Bishop heirs' claim to the Rhue

line as their northeast boundary, there is not the slightest evidence that any known or visible line marked the southeastern boundary of their claim. To ripen title adverse possession must be under "known and visible boundaries such as to apprise the true owner and the world of the extent of the possession claimed." *McDaris v. "T" Corporation,* 265 N.C. 298, 303, 144 S.E. 2d 59, 63.

Plaintiff's motion for a directed verdict against defendants' cross action was properly allowed.

[17, 18] The third question presented is whether the court erred when it refused the issues tendered by defendants and submitted those framed by the court. The answer is NO.

The theory of plaintiff's case is that Batson conveyed to Bishop the southwestern portion of his grant and that he retained 2,574 feet of ocean frontage between the Bishop and Rhue lines, this being the frontage which Price divided among the Batson heirs. The division is valid, and plaintiff's title to lot No. 3 of the division is established, only if Price correctly located the Sidbury line and the Bishop tract, the deed to which calls for an ocean frontage of merely 53 poles or 874.5 feet. In no other way can plaintiff stretch the distance between the Sidbury and Rhue line from the 107 poles (1,765.4 feet) called for in the Batson grant to the 209 poles (3,448.5 feet) shown on the Price map. Therefore, issue No. 1 which the court submitted to the jury would determine whether plaintiff had title to lot No. 3. Plaintiff tendered no issues and he acquiesced in those framed by the court. After defendants' cross action had been dismissed, plaintiff's title to the land described in the complaint was the first remaining issue. Since the jury answered the issue adversely to plaintiff, the court's failure to submit the issues of trespass and damage was harmless error.

We next consider the question whether the judge erred when he refused to sign the judgment which defendants tendered on the verdict and allowed plaintiff's motion, made under G.S. 1A-1, Rule 50(b)(1), to have the jury's verdict set aside and judgment entered in accordance with his motion for a directed verdict at the close of the evidence.

Judge Cowper's judgment recites that he allowed plaintiff's motion for judgment notwithstanding the verdict because plaintiff had "proved without contradiction that he is the owner of

the lands described in the complaint as shown on the Division Map of the lands of Jesse W. Batson, deceased, recorded in Map Book 5, page 78, Pender Registry, by conveyance from the proper heirs of Jesse W. Batson without any lappage or infringement on such lands owned by the defendants. . . ."

[19] The fundamental question raised by this assignment of error is whether, under G.S. 1A-1, Rule 50, the trial judge can direct a verdict in favor of the party having the burden of proof when his right to recover depends upon the credibility of his witnesses. This is a question which has not heretofore been presented to this court, and the answer is NO.

Rule 50, which deals only with jury trials, does not purport to confer upon the judge the power to pass upon the credibility of the evidence and to direct a verdict in favor of the party having the burden of proof—nor could it do so. N. C. Const. art. I, § 19 (recodified as art. I, § 25, effective 1 July 1971) provides: "In all controversies at law respecting property, the ancient mode of trial by jury is one of the best securities of the rights of the people, and ought to remain sacred and inviolable." This section has been construed to guarantee trial by jury in all civil actions where the parties have not waived the right. *Icenhour v. Bowman,* 233 N.C. 434, 64 S.E. 2d 428; *Hershey Corp. v. R. R.,* 207 N.C. 122, 176 S.E. 265; *McDowell v. R. R.,* 186 N.C. 571, 120 S.E. 205. *See also Poultry Co. v. Oil Co.,* 272 N.C. 16, 157 S.E. 2d 693; *Mangum v. Yow,* 263 N.C. 525, 139 S.E. 2d 537; *Ingle v. McCurry,* 243 N.C. 65, 89 S.E. 2d 745; *Sparks v. Sparks,* 232 N.C. 492, 61 S.E. 2d 356; *Fox v. Army Store,* 215 N.C. 187, 1 S.E. 2d 550. North Carolina General Statutes 1A-1, Rule 38, specifically refers to this constitutional provision. Furthermore, Rule 51(a) provides, *inter alia,* that "[i]n charging the jury in any action governed by these rules, no judge shall give an opinion whether a fact is fully or sufficiently proved, that being the true office and province of the jury, but he shall declare and explain the law arising on the evidence given in the case." This identical provision was formerly contained in G.S. 1-180, which—since 1 January 1970—has applied only to criminal cases.

As a consequence of our constitutional and statutory provisions this Court has consistently held that the judge cannot direct a verdict upon any controverted issue in favor of the party having the burden of proof "even though the evidence is uncon-

tradicted." *Rhinehardt v. Insurance Co.*, 254 N.C. 671, 672, 119 S.E. 2d 614, 615; *Shelby v. Lackey*, 236 N.C. 369, 72 S.E. 2d 757; *McCracken v. Clark*, 235 N.C. 186, 69 S.E. 2d 184; *House v. R. R.*, 131 N.C. 103, 42 S.E. 553; *Mfg. Co. v. R. R.*, 128 N.C. 280, 38 S.E. 894; 4 N. C. Index *Trial* § 31 (1961); 2 McIntosh, N. C. Practice and Procedure § 1516 (2d ed. 1956). Justice Rodman stated the rule succinctly in *Chisholm v. Hall*, 255 N.C. 374, 376-77, 121 S.E. 2d 726, 728: "When all the evidence offered suffices, if true, to establish the controverted fact, the court may give a peremptory instruction—that is, if the jury find the facts to be as all the evidence tends to show, it will answer the inquiry in an indicated manner. Defendant's denial of an alleged fact raises an issue as to its existence even though he offers no evidence tending to contradict that offered by plaintiff.

"A peremptory instruction does not deprive the jury of its right to reject the evidence because of lack of faith in its credibility. Such an instruction differs from a directed verdict as that term is used by us. A verdict may never be directed when the facts are in dispute. *The judge may direct a verdict only when the issue submitted* presents a question of law based on admitted facts." (Italics ours; citations omitted.)

In *Pedrick v. Peoria and Eastern Railroad Co.*, 37 Ill. 2d 494, 509, 229 N.E. 2d 504, 513 (1967), this comment was made: "Of all the states in which recent cases were found, North Carolina is the most restrictive, for it allows directed verdicts only when the evidence presents a question of law based on admitted facts. *Chisholm v. Hall*, 255 N.C. 374, 121 S.E. 2d 726; *see also Flintall v. Charlotte Liberty Mutual Ins. Co.*, 259 N.C. 666, 131 S.E. 2d 312."

It has been the rule with us that "[t]he court can always direct a verdict *against* the party on whom rests the burden of proof, if there is no evidence in his favor." (Emphasis added.) *Everett v. Williams*, 152 N.C. 117, 67 S.E. 265. In 1849 Justice Pearson said: "When a plaintiff fails to make out his case, the judge may say to the jury, if all the evidence offered be true, the plaintiff has not made out a case, and direct a verdict to be entered for the defendant, unless the plaintiff chooses to submit to a nonsuit." *State v. Shule*, 32 N.C. 153, 155-156.

As pointed out in *Chisholm v. Hall, supra*, when there is no conflict in the evidence and but one inference is permissible

from it, the court may give a peremptory instruction in favor of the party having the burden of proof. Such an instruction directs the jury to answer the issue in favor of the plaintiff *if* it finds the facts to be as all the evidence tends to show; otherwise not. To so instruct is not to direct a verdict. *In re Will of Roberts,* 251 N.C. 708, 112 S.E. 2d 505; *Stewart v. Jaggers,* 243 N.C. 166, 90 S.E. 2d 308; *Everett v. Williams, supra.* See the comment on directed verdicts by Phillips in the 1969 Supplement to the second edition of McIntosh, N. C. Practice and Procedure § 1516 (hereinafter cited as Phillips).

When granted, the common law motion for a directed verdict resulted in a judgment on the merits in either a criminal or a civil case. For a dicussion of the difference between directed verdicts in criminal and civil cases see *State v. Riley,* 113 N.C. 648, 650, 18 S.E. 168.

Although permissible procedure, the practice of directing a verdict against the party with the burden of proof was little used in this jurisdiction because of the plaintiff's absolute right to take a voluntary nonsuit at any time before verdict. G.S. 1-224 (repealed by N. C. Sess. Laws 1967, Ch. 954, § 4, effective 1 January 1970); *Mitchell v. Jones,* 272 N.C. 499, 158 S.E. 2d 706; *Insurance Co. v. Walton,* 256 N.C. 345, 123 S.E. 2d 780; *Oil Company v. Shore,* 171 N.C. 51, 87 S.E. 938; 4 N. C. Index *Trial* § 29 (1961). Upon the judge's intimation that he would direct a verdict for defendant the plaintiff would take a nonsuit. Whereas a verdict directed against him would have been a disposition of the case on its merits reversible only by appeal, this maneuver left him free either to appeal or to commence a new action. *Pickelsimer v. Pickelsimer,* 257 N.C. 696, 127 S.E. 2d 557; *Hedrick v. Pratt,* 94 N.C. 101; G.S. 1-25 (repealed, N. C. Sess. Laws 1967, Ch. 954, § 4, effective 1 January 1970); Phillips § 1516 (1969 Supp.). In consequence "the directed verdict was abandoned in practice by defendants—though it remained technically available—as had been the demurrer to the evidence. It remained in use under the code only as a means for challenge by plaintiff to the sufficiency of defendants' evidence to support the occasional affirmative defense interposed as the sole defense." Phillips § 1488.5 (1970 Supp.).

[20, 21] Under the new rules of civil procedure a plaintiff can no longer take a voluntary nonsuit as a matter of right or secure a voluntary dismissal without prejudice *after* he has rested his

case. G.S. 1A-1, Rule 41 (a) (1), permits one voluntary dismissal, but the right must be exercised before a plaintiff rests his case. 6 Wake Forest L. Rev. 267, 279. Now, in a jury trial, the motion for a directed verdict is the only device by which the adverse party can challenge the sufficiency of the evidence to go to the jury. The rules do not provide for compulsory nonsuit or dismissal in this situation. Rule 50 (a); Phillips § 1485.5 (1970 Supp.). The comparable motion in a *nonjury* case is the defending party's motion for a dimissal under Rule 41 (b). 2B Barron and Holtzoff, Federal Practice and Procedure § 1075 (Wright ed. 1961, Supp. 1969). *See* Phillips § 1375 (1970 Supp.).

**[22, 23]** When it is clear that the plaintiff has shown no right to relief, the judge will "direct a verdict for the defendant at the close of plaintiff's evidence just as he could formerly grant a motion for compulsory nonsuit." 5 Wake Forest L. Rev. 1, 37 (1969). When a motion for a directed verdict under Rule 50 (a) is granted, the defendant is entitled to a judgment on the merits unless the court permits a voluntary dismissal of the action under Rule 41 (a) (2). Under this rule, as Chief Justice Bobbitt pointed out in *Kelly v. Harvester Co., supra* at 158, 179 S.E. 2d at 398, "[T]he court *may* permit *a voluntary* dismissal upon such terms and conditions as justice requires. *Cone v. West Virginia Pulp & Paper Co.,* 330 U.S. 212, 217, 91 L. Ed. 849, 853, 67 S.Ct. 752, 755, (1947); Sizemore, General Scope and Philosophy of the New Rules, 5 Wake Forest Intra. L. Rev. 1, 38 (1969)." A dismissal under Rule 41 (a) (2) is without prejudice unless the judge specifies otherwise.

Phillips has noted that whether the motion for a directed verdict is available in favor of the party with the burden of proof "is a problem to which Rule 50 does not speak directly." Phillips § 1488.20 (1970 Supp.). It will have to be resolved by judicial decision within constitutional and statutory limitations.

Under Fed. R. Civ. P. 50 (a), which is identical with N. C. R. Civ. P. 50 (a) "[i]t is not a usual thing for the trial judge to direct a verdict in favor of the party having the burden of proof though this has sometimes been done under extreme circumstances." *Polhemus v. Water Island,* 252 F. 2d 924, 928 (3rd Cir.). However, in *U. S. v. Grannis,* 172 F. 2d 507, 513 (4th Cir.), the court, in ordering a directed verdict for the government, said: "In the federal courts the judge should direct a verdict for either party, even if the party has the burden of proof,

Cutts v. Casey

when the facts are so convincing that reasonable men could not differ as to their significance; and this is especially true when there is no conflict in evidence." Here we note parenthetically that the federal rules have no counterpart for our Rule 51(a), which prohibits the trial judge from expressing to the jury an opinion on the evidence.

An effort was made to state the federal rule in 5 Moore's Federal Practice § 50.02(1) (2d ed. 1969) : "The courts are reluctant to direct a verdict in favor of the party carrying the burden of persuasion. On the one hand, it is held that where no evidence is adduced to disprove the *prima facie* case of the proponent and his evidence stands uncontradicted and unimpeached the court should direct a verdict in his favor. On the other hand, it is clear that even when the evidence is uncontradicted, if it is possible to derive conflicting inferences from it, it is error to direct a verdict. And where the proponent's case is totally dependent upon the credibility of his witnesses, the issue is presumably for the jury. But the proponent apparently has no right to go to the jury where the only testimony is against him." *Accord,* 2B Barron and Holtzoff, Federal Practice and Procedure § 1074.1 (Wright ed. 1961). *See Dehydrating Process Co. v. A. O. Smith Corp.,* 292 F. 2d 653, n. 6 at 656 (1st Cir.).

It is quite clear, however, that even in the federal courts evidence is not necessarily conclusive because it is uncontradicted. It is still for the jury if reasonable men may differ as to its truth or if conflicting inferences may reasonably be drawn from it. *Wilkerson v. McCarthy,* 336 U.S. 53, 93 L. Ed. 497. *See Ferdinand v. Agricultural Insurance Company,* 22 N.J. 482, 126 A. 2d 323.

[19]   The established policy of this State—declared in both the constitution and statutes—is that the credibility of testimony is for the jury, not the court, and that a genuine issue of fact must be tried by a jury unless this right is waived. *Sparks v. Sparks, supra.* Whether there is a "genuine issue of fact" is, of course, a preliminary question for the judge. There may be, as suggested by Phillips, § 1488.10 (1970 Supp.), "a few situations in which the acceptance of credibility as a matter of law seems compelled." If so, we will endeavor to recognize that situation when it confronts us.

[24]   Since a directed verdict has always been a means of taking a case from the jury, Rule 50(a) provides that "the order

granting a motion for a directed verdict shall be effective without any assent of the jury." This simply means that the jury has no function when a directed verdict is ordered. The judge has decided that "the question has become one of law exclusively." Thus, it would be "an idle gesture to require the jury to go through the motions of returning the verdict directed." The quoted provision "eliminates this useless formality." Comment on G.S. 1A-1, Rule 50 at p. 682. *See also* 5 Moore's Federal Practice § 50.02(3) (2d ed. 1969), and 5 Wake Forest L. Rev. 150-151.

[25] In this case the court not only erred in directing a verdict in favor of the party having the burden of proof but also in assuming that plaintiff's evidence was uncontradicted. Plaintiff concedes that the testimony of defendants' witness, W. H. Utley, a registered surveyor, contradicted the testimony as to the location of the beginning point and the northeastern line of the Sidbury grant. Furthermore, conflicting inferences as to its location might reasonably be drawn from the great discrepancy between the length of the ocean frontage called for in the Batson grant and that shown on the Price map. In addition defendants' cross-examination sought to show the unreliability of the information and recollections of the witnesses upon whom plaintiff relied to show that point A on the Price map was the beginning of the Sidbury tract. The location of the Sidbury line at points A-E-B was crucial to plaintiff's case. That plaintiff's evidence was not so clear and uncontradicted as to be conclusive as to its location is demonstrated by the jury's verdict against him. We also note that the referee's findings were against plaintiff and that he has been the appellant in the two preceding appeals.

We hold that the judge erred when he declined to sign the judgment tendered by defendants and entered judgment n. o. v.

Defendants' final contention is that the court erred in failing to award them a new trial for errors of law committed during the trial. We have examined each of the ten exceptions upon which defendants base this assignment of error. In none do we find prejudicial error entitling defendants to a new trial.

The judgment n. o. v. which Judge Cowper entered for plaintiff is reversed. The verdict is reinstated, and this cause is remanded to the Superior Court with directions to enter the judgment tendered by defendants. Phillips, § 1488.45(4) (1970 Supp.).

Error and remanded.

Justice HUSKINS concurring in result.

I am in full agreement with the result reached in the majority opinion. There was plenary conflicting evidence in this case, and direction of the verdict was clearly erroneous. I disagree, however, with that portion of the opinion which holds that the trial judge cannot under Rule 50, under any circumstances, direct a verdict in favor of the party carrying the burden of proof. Such a position is in conflict with the philosophy and purposes of the new Rules of Civil Procedure and in conflict with holdings of the federal courts under the identical Federal Rule 50.

First of all, the direction of a verdict in favor of the party having the burden of proof, or any other party, is not a violation of constitutional provisions guaranteeing a jury trial in all controversies respecting property. N. C. Const., Art. I, § 19 (to become Art. I, § 25 on July 1, 1971). This is so because there is no constitutional right to go to the jury with an argument on facts insufficient as a matter of law to make out a claim. Nor is there a constitutional right to try to persuade a jury, by emotion alone, that plaintiff's case should not prevail when the evidence is uncontradicted or is such that rational men would be unable to differ. The United States Supreme Court faced this problem in construing Federal Rule 50 in *Galloway v. United States,* 319 U.S. 372, 87 L. Ed. 1458, 63 S. Ct. 1077 (1943). The Court held that the Seventh Amendment, which guarantees trial by jury in cases at common law where the value in controversy exceeds $20.00, did not prohibit the direction of a verdict under Federal Rule 50. After pointing out that challenges to the sufficiency of the evidence are nothing new, the Court commented that whatever standard for sufficiency is used, "the essential requirement is that mere speculation be not allowed to do duty for probative facts, after making due allowance for all reasonably possible inferences favoring the party whose case is attacked." *See* Comment, Directed Verdicts and the Right to Trial by Jury in Federal Courts, 42 Texas L. Rev. 1053 (1964).

North Carolina has likewise had such guaranties against jury prejudice in the past. The demurrer to the evidence and the old peremptory instruction, for instance, are procedures heretofore used to decide, *as a matter of law,* whether the jury should have complete freedom to act. 2 McIntosh, North Carolina Prac-

tice and Procedure (2d Ed., 1956), §§ 1482, 1488, 1516, 1596 (4). Thus, curbs on the absolute freedom of the jury are nothing new in our practice and have not been construed in the past to offend jury trial provisions of our Constitution. McIntosh, *supra,* §§ 1431, 1488. The crux of the problem seems to be the determination of what is a question of law and what is a question of fact.

This brings us to the second reason for the conclusion of the majority. Rule 51 (a) provides in part: "In charging the jury in any action governed by these rules, no judge shall give an opinion whether a fact is fully or sufficiently proved, that being the true office and province of the jury, but he shall declare and explain the law arising on the evidence given in the case." The majority notes that there is no counterpart for this rule in the federal practice and, in this manner, apparently distinguishes numerous cases from federal jurisdictions and from other states which hold that in appropriate circumstances a verdict may be directed in favor of the party with the burden of proof. *See, e.g., Stewart v. Gilmore,* 323 F. 2d 389 (1963) ; *United States v. Grannis,* 172 F. 2d 507 (1949) ; *Bliss v. DePrang,* 81 Nev. 599, 407 P. 2d 726 (1965). *See also* 5 Moore's Federal Practice, § 50.02 (1) ; 2B Barron and Holtzoff, Federal Practice and Procedure (Wright Ed., 1961), § 1074.1.

We are aware that Rule 51 (a) is an almost verbatim application of old G.S. 1-180 (now limited to criminal actions) to civil actions governed by the new rules, and that G.S. 1-180 has in the past been held to apply to comment *at any time* during the trial. *Hyder v. Battery Co.,* 242 N.C. 553, 89 S.E. 2d 124 (1955). This settled law need not be disturbed for this Court to hold that the judge can direct a verdict in favor of the party having the burden of proof. This is so because the determination of a motion for directed verdict is a question of law and not a question of fact. 2 McIntosh, *supra,* §§ 1482, 1516; 2B Barron and Holtzoff, *supra,* §§ 1071-1072.

Dean Dickson Phillips is cited by the majority to support its conclusion. Dean Phillips, on the contrary, states that Rule 51 (a) should *not* prevent a direction of a verdict for a party with the burden of proof and suggests that the practice be allowed in North Carolina "in the interest of expeditious administration of justice in the rare cases where appropriate." Phillips, 1970 Pocket Part, McIntosh, *supra,* § 1488.20. Dean Phillips explained

Cutts v. Casey

his views in these words: "While the idea that the no-comment rule technically controls here is well imbedded in our decisions, it technically has nothing to do with this problem. The no-comment rule is one designed to prevent a judge's intrusion on the fact finding functions of the jury *after* he has decided the prior question of law: 'Is there a genuine issue of fact requiring jury determination?' It speaks not at all to the basis for deciding this preliminary question. Courts allowing this practice consider that the decision to direct verdict for the party with the burden is equally a matter of law with that to direct verdict against the party with the burden. In this case it is a decision that on all the evidence no jury acting rationally could fail to find for the movant. This does indeed involve accepting (not assuming) credibility, but this is no more and no less a matter of law than deciding that only one inference may be drawn from evidence, or that evidence assumed to be credible does not amount to a 'scintilla,' etc. To deny the right ever to direct a verdict for the party with the burden is to deny that there can be circumstances when credibility is manifest as a matter of law. This would be logically at odds with a parallel attitude firmly accepted in our practice; that evidence can be manifestly incredible as a matter of law." See, as to the question of credibility, Fleming James, Sufficiency of the Evidence and Jury-Control Devices Available Before Verdict, 47 Va. L. Rev. 218 (1961), where the writer says, at 233: "So far as credibility goes, *all* courts consider it on a motion for directed verdict to the minimum degree of determining whether testimony is capable of belief by reasonable men or is incredible as a matter of law."

That this conclusion is correct may be seen by reading Rules 50(a) and 51(a) *in pari materia*, as we are required to do. Rule 50(a) uses the words "a party" instead of "a defendant" to refer to the movant, and the words "an opponent" rather than "a plaintiff" to refer to the resisting party. Surely this language must be read to allow directed verdicts for either party. The language of Rule 51(a) should be read to apply only to the conduct of the judge *before* he takes the case from the jury as a matter of law. Indeed, the language of Rule 50(a) at one point reads: "A motion for a directed verdict which is not granted is not a waiver of trial by jury *even though all parties to the action have moved for directed verdicts*." (Emphasis added.) The majority view makes these words meaningless.

Moreover, the official comment accompanying Rule 50 reads: "The rule further contemplates that *any party* may move for a directed verdict at the close of all the evidence." (Emphasis added.) One writer assumes without discussion that the plaintiff and the defendant could move for a directed verdict, contrary to "the former North Carolina practice." J. McNeill Smith, Trial Under the New Rules, 5 Wake Forest Intra. L. Rev. 138 at 151 (1969).

It is my view that the intention of the General Assembly was to give North Carolina a directed verdict procedure which tracks the federal rule in all material respects, inasmuch as the wording is identical. *See* James E. Sizemore, General Scope and Philosophy of the New Rules, 5 Wake Forest Intra. L. Rev. 1 (1969), and the numerous references to the federal rules throughout the official comments. This Court has already declared that it would be guided by the federal experience where apposite. *Sutton v. Duke,* 277 N.C. 94, 176 S.E. 2d 161 (1970). Other states, in their interpretation of state adaptations of the federal rules, have done likewise. *See Elliot v. Harris,* 423 S.W. 2d 831 (Mo., 1968); *Schacter v. Albert,* 212 Pa. Super. 58, 239 A. 2d 841 (1968); *Canaday v. Superior Court,* 49 Del. 456, 119 A. 2d 347 (1955); *Rogge v. Weaver,* 368 P. 2d 810 (Alaska, 1962).

Furthermore, the rule propounded in the majority opinion is inharmonious with Rule 56 in some instances. Rule 56 requires that upon motion for summary judgment before trial, the trial judge must decide as a matter of law whether or not there is a "genuine issue as to any material fact," and, if not, enter summary judgment for the movant. Rule 56 specifically provides that the movant may be a "party seeking to recover upon a claim," that is, the plaintiff or any other party having the burden of proof with respect to an asserted claim. The majority reasoning, if applied to Rule 56, would seem to preclude its application to the party with the burden of proof and ignore the explicit language of the rule. If the majority reasoning is inapplicable to Rule 56, we have an anomalous situation where the judge may decide as a matter of law *before* the trial that no genuine issue as to any material fact exists but is forbidden to make such determination upon motion for a directed verdict at the close of the evidence. In my opinion such result was not intended by adoption of the new rules. In fact, some courts

have used the same test for summary judgment as for directed verdict. "A popular formula is that summary judgment should be granted on the same kind of showing as would permit direction of a verdict were the case to be tried. In applying this principle the court should consider both the record actually presented and the record potentially possible at the trial." 3 Barron and Holtzoff, Federal Practice and Procedure (Wright Ed., 1958), § 1234. *See also* Phillips, *supra*, §§ 1660.5, 1660.10.

Research has revealed no recent federal case, including those cited by the majority, which prohibits *under all circumstances* the direction of a verdict in favor of the party with the burden. Likewise, cases decided by state courts during the last fifteen years virtually all support the proposition that in appropriate circumstances, which vary from state to state, a verdict may be directed for the party with the burden of proof. *See Walters v. Bank of America*, 9 Cal. 2d 46, 69 P. 2d 839, 110 A.L.R. 1259 (1937); *Stephens v. Carter*, 215 Ga. 355, 110 S.E. 2d 762 (1959); *Nutwood Drainage and Levee District v. Mamer*, 10 Ill. 2d 101, 139 N.E. 2d 247 (1956); *Burke v. Kaschke*, 80 Ill. App. 2d 359, 224 N.E. 2d 473 (1967); *Seaton v. Tucker*, 325 P. 2d 82 (Okla., 1958); *Fox v. Massey-Ferguson, Inc.*, 206 Kan. 97, 476 P. 2d 646 (1970); *Coulthard v. Keenan*, 256 Iowa 890, 129 N.W. 2d 597 (1964); *Rogers v. Thompson*, 364 Mo. 605, 265 S.W. 2d 282 (1954); *Keeler v. Maricopa Tractor Co.*, 59 Ariz. 94, 123 P. 2d 166 (1942); *Whitly v. Moore*, 5 Ariz. App. 369, 427 P. 2d 350 (1967); *Peroti v. Williams*, 258 Md. 663, 267 A. 2d 114 (1970); *Sommerville v. Pennsylvania R. R. Co.*, 151 W. Va. 709, 155 S.E. 2d 865 (1967); *Bliss v. DePrang*, 81 Nev. 599, 407 P. 2d 726 (1965).

In summary, it is my view that (1) the constitutional provision guaranteeing the right to a jury trial does not prevent the direction of verdicts for the plaintiff or the defendant; (2) Rule 51(a) has no application to the direction of verdicts but applies only to judicial comment before the jury on questions of fact; (3) complete harmony with Rule 56 requires an interpretation that verdicts can be directed for either party; (4) there is little authority, save old cases decided before the enactment of the new rules, for the views expressed in the majority opinion, while many courts have held otherwise; and (5) this Court should follow the federal interpretation in all instances where our rule is a verbatim copy of its federal counterpart.

Finally, it is not necessary for us to decide in this case whether a verdict may be directed in favor of the party with the burden of proof. There will be time enough to decide that question when we are confronted with it in a close case. I am unwilling to foreclose for all time the possibility of the direction of a verdict in favor of the party with the burden.