HARRIS, UPHAM & COMPANY, INC. AND ITS SUCCESSORS, SMITH BARNEY, HARRIS UPHAM & COMPANY, INCORPORATED v. JAMES N. PALIOURAS

No. 7714SC359

(Filed 7 March 1978)

Accounts § 2— action on commodities account—account stated—amount of indebtedness

In plaintiff broker's action to recover an amount allegedly owed to it by defendant as a result of losses to defendant's commodities trading account, an account stated was established by the jury's finding that defendant did not protest within a reasonable time the transactions entered into by plaintiff on defendant's behalf and the statements of the account rendered by plaintiff to defendant, and plaintiff was entitled to have the jury answer an issue as to the amount of defendant's indebtedness to plaintiff.

APPEAL by plaintiff and defendant from *Hobgood, Judge.* Judgment entered 10 November 1976 in Superior Court, DURHAM County. Heard in the Court of Appeals 9 February 1978.

Plaintiff, a registered broker-dealer, instituted this action on 1 November 1974 against defendant, its former customer, seeking recovery of $72,200 allegedly owing plaintiff as a result of losses to defendant's commodities trading account. Attached to the complaint is an itemized statement showing the commodities, wheat and silver, purchased and sold allegedly in accordance with defendant's instructions, and the loss resulting therefrom which exceeds $35,000 deposited by defendant in his margin account.

In his answer, defendant admitted that the purchase and sales were made but denied that they were made in accordance with his instructions. He counterclaimed for $13,750, the amount

which he alleges would have been left in his account had plaintiff not breached its fiduciary obligation to execute, with such diligence and reasonable care as is consistent with the standards prevailing in the broker-dealer industry, all purchase and sale orders placed by defendant.

Relying to the counterclaim, plaintiff admitted the existence of an obligation to execute defendant's orders with diligence and reasonable care consistent with the standards prevailing in the industry but denied breaching that obligation.

Plaintiff's evidence tended to show:

On 11 February 1974 defendant contacted plaintiff's Durham office about the possibility of opening a commodities account. Plaintiff mailed some information to defendant and a week later defendant called back and stated his desire to open an account. Plaintiff thereupon mailed to defendant five documents for execution: a Customer's Agreement setting forth the duties of plaintiff and its customers including the statement that reports of the execution of orders, and statements of the accounts of defendant, would be conclusive on defendant if not objected to in writing, the former within two days and the latter within ten days after being forwarded to defendant by mail or otherwise; a Commodity Customer's Agreement; an Authorization to Transfer Customer's Segregated Funds; a Commodity Suitability Letter requiring the customer to disclose his liquid assets and previous commodities trading experience so that plaintiff could determine defendant's suitability for trading on the risky commodities market; and a letter detailing the risks involved in the commodities market and providing that the customer, by signing, indicates his understanding of the risks and his willingness to assume them. Defendant signed the documents on 21 and 25 February 1974 and mailed them to plaintiff with a $35,000 check.

Plaintiff's Durham office received the documents and check on the morning of Monday, 25 February 1974, and immediately called its New York office for approval of the account as defendant was very anxious to begin trading. Verbal approval was given on the basis of information supplied by defendant in the suitability letter indicating liquid assets of $500,000, a yearly income of $100,000, four bank accounts and two years of experience in trading on the commodities market.

At 11:30 a.m. on 25 February 1974 defendant placed four pur-
chase orders, all for silver. At 11:31 a.m. the orders were
transmitted to the market in New York by Teletype but by that
time the silver market was locked "limit up", meaning the price
had already fluctuated upward as far as was allowed for that day
and no more purchases could be made. The market opened at
10:00 a.m. and had the orders been made earlier they might have
been executed as there was some trading on the market prior to
its becoming locked limit up. The market remained locked limit
up for the remainder of the day. The orders placed by defendant
were "day orders" and expired at the end of that day. Defendant
was informed by telephone that the orders had not been ex-
ecuted.

On 26 February 1974 defendant ordered five contracts (25,000
bushels) of May Wheat and five contracts of December Wheat;
these orders were executed by plaintiff. On the same day defend-
ant also gave plaintiff five orders for silver but these orders were
not executed because the silver market remained locked limit up.
Defendant was informed by telephone at the end of the day that
the wheat orders had been executed but the silver orders had
not; a confirmation slip was mailed to defendant (a resident of
Chapel Hill, N. C.) that night. Plaintiff informed defendant on that
date that had the silver orders been executed, more money would
have been required for his margin account; defendant indicated
that he understood.

On 27 February 1974 defendant called in orders to buy five
October silver and five December silver contracts; these orders
were executed that afternoon when the silver market became
unlocked and finally began to move downward. Defendant was in-
formed of the purchase by telephone and a confirmation slip was
mailed to defendant that night. Defendant was also informed that
an additional $30,000 was now required for his margin account
and he responded "no problem".

On Thursday, 28 February 1974, no purchase orders were
entered by defendant. On the next day, 1 March 1974, plaintiff
and defendant had become concerned because silver had con-
tinued to drop and defendant's account had suffered large losses.

Defendant called plaintiff's Durham office and did not seem
to know what to do but talked vaguely about some "strange

price" theory. Plaintiff suggested that defendant do a "spread" by unloading some March silver, the only silver which could be traded at that time as the silver market had become locked limit down. Due to the risk involved in such a maneuver, plaintiff's Durham representative suggested that defendant talk with someone in its New York office. At defendant's request plaintiff had its Mr. Boyd call defendant from New York. Mr. Boyd agreed that a "spread", though risky, was the only option to defendant to prevent his losses from getting larger. Defendant did not indicate what he wanted to do and placed no orders on 1 March 1974.

On Monday, 4 March 1974, plaintiff heard nothing from defendant although plaintiff's Durham office had seven telephone lines. By that time defendant's losses had grown and over $60,000 was required for his margin account. On 5 March 1974 plaintiff informed defendant that $60,000 was required; defendant stated that there was no way he could come up with that much money but that he would send plaintiff $15,000 immediately. Plaintiff has never received the $15,000.

Also on 5 March 1974 defendant instructed plaintiff to liquidate his wheat holdings which plaintiff did, producing a debit to defendant's wheat account of $5,800; a confirmation slip showing these transactions was mailed to defendant. At this time plaintiff's New York office sent a telegram to defendant informing him that unless additional funds were placed in his margin account by 6 March 1974 his account would be closed out. The New York office had been calling defendant for additional money since 27 February 1974 when the silver was purchased for him.

On 6 March 1974, when no money was forthcoming from defendant, his remaining holdings were sold by plaintiff, resulting in a debit to his silver account of $66,400; a confirmation slip showing these transactions was mailed to defendant.

On 31 March 1974 a statement of account was mailed to defendant showing a total debit balance of $72,200. Similar statements of account were also mailed to defendant at the end of April, May and June 1974. Defendant never complained about the manner in which his account was handled, never paid the debit and has never filed any written objections to the confirmation slips or the statements of account.

Defendant's evidence tended to show:

He signed the papers sent to him by plaintiff but did not read them carefully as plaintiff referred to them as a "mere formality". His account with plaintiff was opened on 25 February 1974. He placed his first purchase order at 10:30 a.m. on that date for May and December wheat and five contracts of silver, any month. The wheat order was not executed until 26 February 1974 and the silver order was not executed until 27 February 1974.

He protested to plaintiff orally about the manner in which his orders had been executed. On 28 February 1974 he ordered plaintiff to "spread" or "straddle" his position by selling March silver. Plaintiff's Durham employees did not appear to know what a "straddle" was so they asked his permission to have their New York office call him.

Mr. Boyd of the New York office called him on Friday, 1 March 1974, agreed that a straddle was appropriate and told defendant that he would take care of the order. Defendant attempted to call plaintiff's Durham office on Monday, 4 March 1974, but all the telephone lines were busy. On 5 March 1974 he learned that his straddle order had not been executed, causing his losses to increase tremendously. Had he known the straddle would not be executed on 1 March 1974, he would have liquidated on that date. Had his orders been executed on the dates on which they were given, and had his account been liquidated on 1 March 1974, he would have suffered a loss of between $2,250 and $32,000, based on the ranges of selling prices on those dates. Thereupon, plaintiff owes defendant between $3,000 and $32,750.

Defendant received all of plaintiff's confirmation slips and statements of account; he did not protest in writing because he had already protested verbally and was never told by plaintiff to put his protest in writing.

At the close of defendant's evidence plaintiff moved for a directed verdict on the counterclaim but the motion was denied. Plaintiff presented rebuttal evidence. At the close of all the evidence defendant moved to amend his prayer for relief in his counterclaim to $32,750 but that motion was denied. Plaintiff renewed its motion for a directed verdict on the counterclaim and that motion was denied.

Harris, Upham & Co. v. Paliouras

Issues were submitted to and answered by the jury as follows:

Issue No. 1. Did plaintiff and defendant enter into written contracts entitled "Customer's Agreement" and "Commodity Customer's Agreement" whereunder plaintiff became defendant's agent for the purposes of taking defendant's commodity orders and handling his commodity transactions?

Answer: Yes.

Issue No. 2. Did plaintiff under those contracts render to defendant accounts dated March 31, April 30, and May 31, for the Silver "unregulated account"?

Answer: Yes.

Issue No. 3. Did plaintiff under those contracts render to defendant accounts dated March 31, April 30, and May 31 for the Wheat "regulated account"?

Answer: Yes.

Issue No. 4. Did plaintiff, by its actions or words, waive any requirement of written notification as stated in the Contract?

Answer: No.

Issue No. 5. Did defendant protest within a reasonable time the account and transactions entered into by plaintiff on behalf of defendant?

Answer: No.

Issue No. 6. Under the counterclaim, did plaintiff breach its agency relationship with defendant?

Answer: Yes.

Issue No. 7. In what amount, if any, is defendant indebted to plaintiff? Issue No. 7 is not answered.

Issue No. 8. In what amount, if any, is plaintiff indebted to defendant?

Answer: $13,750.00.

Plaintiff moved for judgment notwithstanding the verdict or a new trial but the motions were denied. Thereafter the court, on its own motion, entered judgment notwithstanding the verdict as to Issues 6 and 8 on the ground that the evidence thereon was insufficient to be submitted to the jury.

Plaintiff then tendered a judgment awarding it $72,200 as a matter of law based upon the jury answers to Issues 1 through 5 but the court rejected the tendered judgment and entered judgment allowing the jury's verdict on Issue 7 to stand, resulting in no recovery by either party. Both parties appealed.

*Haywood, Denny & Miller, by Egbert L. Haywood, for plaintiff appellant.*

*Newsom, Graham, Strayhorn, Hedrick, Murray, Bryson & Kennon, by Josiah S. Murray III, for defendant appellee.*

BRITT, Judge.

While the able attorneys for the parties have discussed in their respective briefs detailed contentions of their clients relating to various aspects of the trial, we think a proper disposition of the appeals should be made on a consideration of the basic contentions of the parties.

Plaintiff contends primarily that this is an action on an account stated: that an account stated was established by the jury's answers to the first five issues; that the trial court erred in denying its motions for directed verdict on defendant's counterclaim; and that when the court entered judgment notwithstanding the verdict on the counterclaim, it should have awarded plaintiff judgment for the amount prayed.

Defendant disagrees with the stated contentions of plaintiff and further contends that the court erred in granting judgment n.o.v. on Issues 6 and 8, the issues relating to his counterclaim.

Both parties cite as a recognized authority on stockbroker law Meyer's treatise entitled *The Law of Stockbrokers and Stock Exchanges.* Plaintiff quotes from § 105, pp. 424 to 429, as follows:

(§ 105) 6. Broker's Statements as Accounts Stated.

(a) Acceptance; Retention without Objection.

An account rendered by a broker to his customer if expressly or impliedly assented to by the latter becomes an account stated. As such it is binding on the customer, except where there has been fraud or mistake, as to all matters which it embraces. The broker may institute suit on the account stated and recover by proving the rendition of the account and the customer's express or implied assent to it. He need not establish the transaction on which the account was based, for by the stating of the account a new contract arises between the parties which is independent of the original transaction and the consideration therefor. (Footnotes omitted.)

\* \* \*

It is not necessary, however, for the customer to take an affirmative step in order to establish a broker's statement as an account stated. The receipt of the statement by the customer and his retention of it for a reasonable time without objection is regarded as an implied assent to its correctness. If the customer objects to the account or to any of its items, it is his duty to speak. Silence will be deemed acquiescence. (Footnotes omitted.)

\* \* \*

(b) Form of Statement.

An account rendered, in order to become an account stated, need not be in any particular form. The monthly statements which brokers ordinarily render to their customers are sufficient. "An account rendered is one which is drawn up in form and delivered by the creditor to the debtor as an exhibition of the former's demand." Any statement which complies with this requirement will become an account stated if accepted or if retained without objection. (Footnotes omitted.)

\* \* \*

(c) Objection to Statement.

\* \* \*

The customer's objection to the account will be ineffective unless communicated to the broker. A secret disclaimer amounting only to a mental operation is insufficient.

(d) Timeliness of Objection.

An objection to an account rendered, in order to be effective, must be made within a reasonable time. The question of what time is reasonable is ordinarily one of fact for the jury, but the time which has elapsed in any particular case may be either so long or so short as to present a question of law for the court. (Footnotes omitted.)

A concise statement of the law relating to accounts stated in this jurisdiction is set forth in 1 Strong's N.C. Index 3d, Accounts § 2, as follows.

An account becomes an account stated when a balance is struck and agreed upon as correct after examination. Express agreement is not necessary, but an agreement may be implied by failure to object to an account within a reasonable time after the other party calculates the amount due and submits his statement of the account. What is a reasonable time is to be determined upon the basis of the circumstances of each case, and is ordinarily a question for the jury, certainly when there is conflict in the evidence or if adverse inferences may be drawn therefrom.

*   *   *

An account stated constitutes a new and independent cause of action and is conclusive on the parties in the absence of fraud or mistake. . . .

We perceive very little if any basic difference in the two statements of the law. We proceed now to try to apply the law to the case at hand.

While the agreement which defendant signed with plaintiff provides that reports of the execution of orders, and statements of the accounts of defendant customer, would be conclusive on defendant if not objected to in writing, the former within two days and the latter within ten days after being forwarded to defendant by mail or otherwise, Judge Hobgood elected not to apply so rigid a rule to defendant. On the contrary, by submitting Issue No. 5, he applied the "reasonable time" rule stated above. Since the jury answered the issue in favor of plaintiff, it is not in position to complain that the rigid provision set forth in the agreement was not applied.

We think the trial court erred in submitting Issues 6 and 8, particularly in the absence of an instruction that they would not be answered unless Issue No. 5 was answered in the affirmative. Even so, plaintiff is not in position to complain that Issues 6 and 8 were submitted since the court granted judgment notwithstanding the verdict as to them.

The remaining question relates to Issue No. 7, the amount of defendant's indebtedness to plaintiff. We think plaintiff was and is entitled to have this issue answered. While plaintiff cites authorities from other jurisdictions supporting its argument that the court should have answered the issue $72,200, the amount prayed for in the complaint and shown on the statements rendered to defendant, we are of the opinion that the issue should be answered by a jury.

In *Cutts v. Casey*, 278 N.C. 390, 180 S.E. 2d 297 (1971), our Supreme Court held that the trial judge cannot direct a verdict under G.S. 1A-1, Rule 50, in favor of the party having the burden of proof when his right to recover depends upon the credibility of his witnesses, since it is the established policy of this State—declared in both constitution and statutes—that the credibility of testimony is for the jury, not the court, and a genuine issue of fact must be tried by a jury unless the right is waived.

For the reasons stated, we order that the portions of the judgment appealed from (1) allowing the verdict of the jury as to Issue No. 7 to stand, and (2) providing that plaintiff recover nothing of defendant, be vacated and that this cause be remanded to the superior court for a jury trial on Issue No. 7. In other respects, the judgment is affirmed.

Judgment affirmed in part, vacated in part, and cause remanded for further proceedings.

Judges HEDRICK and WEBB concur.