CLARENCE SMITH, Plaintiff v. CAROLINA COACH COMPANY, Defendant

No. COA94-896

(Filed 5 September 1995)

1. **Principal and Agent § 18 (NCI4th)— conversion by sub-agent—agent's liability to principal—jury question**

A jury question was presented as to whether plaintiff agent was liable for his subagent's conversion of defendant bus company's property and thus breached his contract with defendant

SMITH v. CAROLINA COACH CO.

[120 N.C. App. 106 (1995)]

under the theory that an agent is responsible to the principal for the conduct of a subagent with reference to the principal's affairs entrusted to the subagent where the evidence tended to show that plaintiff contracted to operate defendant's Washington and Greenville bus terminals; plaintiff hired a subagent to operate the terminals and to sell the tickets which defendant assigned to plaintiff pursuant to defendant's inventory control procedures; the subagent conspired with two of defendant's employees to sell tickets stolen from the Raleigh terminal and split the profits; evidence that the subagent could not have sold the stolen tickets without the use of the validator machines at plaintiff's terminals supports a conclusion that the subagent acted with reference to the principal's affairs entrusted to him; and evidence that plaintiff was only authorized to sell tickets which were entrusted and assigned to him supports a conclusion that the subagent did not act with reference to the principal's affairs entrusted to him.

**Am Jur 2d, Agency §§ 157-167.**

2. **Principal and Agent § 18 (NCI4th)— subagent's sales of stolen tickets—agent's failure to report—no breach of agency agreement**

Defendant bus company failed to establish that plaintiff ticket agent breached provisions of its agency agreement by failing to report the sales of stolen tickets by a subagent, to hold the proceeds of those tickets in trust, and to indemnify defendant for the proceeds of the sales of the stolen tickets where defendant presented no evidence that plaintiff ever received the proceeds of the sale of the stolen tickets or that plaintiff either knew or should have known about their sale.

**Am Jur 2d, Agency §§ 157-167, 333-335, 338.**

3. **Libel and Slander § 43 (NCI4th)— defamation claim— insufficiency of evidence of publication and prejudice**

The trial court did not err in granting defendant's motion for directed verdict on plaintiff's defamation claim since letters from defendant's counsel to plaintiff's counsel regarding plaintiff agent's contractual liability for the proceeds of the sale of stolen tickets contained no defamatory statements and were privileged as communications relevant to proposed judicial proceedings; persons who were eight to ten feet away when one of defendant's agents accused plaintiff of stealing tickets and not reporting their

SMITH v. CAROLINA COACH CO.

[120 N.C. App. 106 (1995)]

sale could not recall hearing any defamatory remarks and were distracted by a customer; statements made by defendant's agent in the presence of plaintiff's fiancee had no tendency to prejudice plaintiff in his reputation, office, trade, or business or hold him up to disgrace, ridicule, or contempt because plaintiff had previously advised his fiancee that defendant's agent had falsely accused him of stealing tickets; and plaintiff failed to establish publication of statements to customers because the proximity of the customers to defendant's agent was unclear.

**Am Jur 2d, Libel and Slander § 443.**

Appeal by plaintiff and defendant from judgment entered 28 March 1994 by Judge J. Richard Parker in Beaufort County Superior Court. Heard in the Court of Appeals 10 May 1995.

*Wayland J. Sermons, Jr., P.A. for plaintiff-appellant/appellee.*

*Parker, Poe, Adams & Bernstein, L.L.P., by Renee J. Montgomery, John J. Butler, and Jim Wade Goodman, for defendant-appellee/appellant.*

WALKER, Judge.

Plaintiff sued defendant for breach of contract and defamation arising out of defendant's termination of written agency agreements (agreements) by which plaintiff operated defendant's Washington and Greenville bus terminals as its exclusive agent. Under the agreements, plaintiff was to serve as defendant's commission agent for the sale of tickets, provide passenger and freight services, and conduct station operations at defendant's Washington and Greenville stations. Defendant terminated the agencies in late April 1992, after plaintiff refused defendant's requests that plaintiff reimburse it for 230 tickets which had been sold at plaintiff's agencies and for which sales proceeds had not been remitted. These tickets bore the imprinter stamp of the validator machines at plaintiff's stations and were from a series of 1250 tickets missing from defendant's ticket supply.

Defendant counterclaimed for breach of contract and conversion. Defendant alleged, in part, that plaintiff breached his obligations under paragraphs 3(b),(c), and (e) of the agreements by failing to: (1) prepare and submit accurate and complete reports accounting for all sales and collections made at the Washington and Greenville stations, (2) hold in trust and deposit daily in the bank designated by defend-

ant all funds collected at these stations, and (3) indemnify defendant for loss of its property represented by the tickets that had been sold at the Washington and Greenville stations and had not been remitted to defendant. Defendant further alleged that plaintiff's employees, who were hired by plaintiff to sell defendant's tickets, converted approximately $123,400 worth of defendant's tickets for which plaintiff was thus liable.

At the close of plaintiff's evidence, defendant moved for a directed verdict on all claims and counterclaims. The trial court granted defendant's motion on plaintiff's defamation claim and denied it on the remaining claims and counterclaims. At the close of all the evidence, plaintiff moved for a directed verdict on all counterclaims and defendant moved for a directed verdict on all remaining claims and counterclaims, which motions were denied. The jury answered all issues against the defendant and found for plaintiff on his breach of contract claim. Defendant moved for judgment notwithstanding the verdict, which the trial court denied. From the denial of his motions for directed verdict and judgment notwithstanding the verdict, defendant appeals. Plaintiff appeals from the grant of a directed verdict for defendant on the defamation claim.

[1] We first address the denial of defendant's motion for directed verdict and judgment notwithstanding the verdict on defendant's counterclaims for conversion and breach of contract and plaintiff's claim for breach of contract. In determining whether the evidence is sufficient to withstand a motion for directed verdict, plaintiff's evidence must be taken as true and all the evidence must be viewed in the light most favorable to him, giving him the benefit of every reasonable inference which may legitimately be drawn therefrom, and resolving any conflicts, contradictions and inconsistencies in his favor. *Hornby v. Penn. Nat'l Mut. Casualty Ins. Co.*, 62 N.C. App. 419, 422, 303 S.E.2d 332, 334, *cert. denied*, 309 N.C. 451, 307 S.E.2d 364, 365 (1983). The same standard applies for determining whether to grant a judgment notwithstanding the verdict. *Weyerhaeuser Co. v. Godwin Bldg. Supply Co.*, 40 N.C. App. 743, 745, 253 S.E.2d 625, 627 (1979).

Ordinarily, it is not permissible to direct a verdict in favor of a party who carries the burden of proof. *Stutts v. Green Ford, Inc.*, 47 N.C. App. 503, 517, 267 S.E.2d 919, 927 (1980). However, a directed verdict for the party with the burden of proof is not improper where its right to recover does not depend on the credibility of its witnesses and the pleadings, evidence, and stipulations show that there is no

issue of genuine fact for jury consideration. *Paccar Fin. Corp. v. Harnett Transfer, Inc.*, 51 N.C. App. 1, 5, 275 S.E.2d 243, 246, *cert. denied*, 302 N.C. 629, 280 S.E.2d 441 (1981). But where an issue is controverted, a directed verdict is improper even though the evidence is uncontradicted. *Cutts v. Casey*, 278 N.C. 390, 417, 180 S.E.2d 297, 311 (1971).

The parties introduced the agreements into evidence, which contained the following provisions:

3. Agent's Obligations.

. . .

(b) Agent shall prepare and submit accurate and complete reports accounting for all sales and collections in strict compliance with Company's instructions.

(c) All funds collected by Agent for Company shall be the property of Company and shall be held in trust exclusively for the Company's benefit, deposited daily in a bank or banks designated by Company.

. . .

(e) Agent shall indemnify and save Company harmless from and against any and all claims, liabilities and causes of action for injury to or death of any person[s] . . ., or loss or damage to any property . . . arising out of or attributable to the performance of Agent or any of his employees or agents, or any injury to or death of Agent's employees, except when such injury to or death of persons or damage to or loss or property is due solely to the negligence of Company.

. . .

(g) Agent will safeguard and account for all tickets and busbills assigned and entrusted to him. When documents cannot be located, it is agreed they shall be settled by Agent paying the Company an amount equal to the average sales price for that ticket or busbill actually sold by the Agent during the week the missing ticket or busbill would have been sold.

Plaintiff's evidence showed that in May 1990 plaintiff hired Caesar Freeman to operate the Washington and Greenville terminals and to sell the tickets which defendant assigned to him pursuant to defendant's inventory control procedures. These procedures pro-

vided that plaintiff fill out a requisition form to obtain tickets for sale at his terminals, which defendant would ship to plaintiff on an incoming bus. After acknowledging receipt of the tickets, plaintiff was responsible for their cash value. These procedures were part of the "instructions" referred to in paragraph 3(b). Unknown to the plaintiff, Freeman conspired with a bus driver who was employed by defendant to sell tickets which had been stolen from the stock room of defendant's Raleigh office and split the proceeds of their sale with the bus driver and defendant's stock room clerk. Plaintiff testified to the effect that, pursuant to paragraph 3, sections (b) and (c), he prepared accurate and complete reports and deposited all funds received for tickets that were entrusted and assigned to him.

Defendant's evidence showed that 230 tickets which had been stolen from defendant's stock room in Raleigh bore the stamp of the validating machines at plaintiff's agencies. The stolen tickets could not have been sold without the use of the validating machines at plaintiff's agencies. Defendant presented no evidence tending to show that defendant either knew or should have known about the sale of the stolen tickets.

The trial court instructed the jury that if it found plaintiff liable for conversion, it must also find him liable for breach of the agency agreements. Defendant argues that under *Colony Associates v. Fred L. Clapp & Co.*, 60 N.C. App. 634, 300 S.E.2d 37 (1983), plaintiff is strictly liable to defendant for the acts of his subagent and that the trial court should have granted its motion for directed verdict on its counterclaims for conversion and breach of contract since the uncontradicted evidence shows that plaintiff's subagent converted 230 tickets for which defendant sustained damages of $23,926.

We disagree that plaintiff, as defendant's agent, is strictly liable for the acts of his subagent. In *Colony Associates*, we reversed the entry of directed verdict and judgment notwithstanding the verdict for defendant on plaintiffs' claim against their agent, Clapp, and remanded for a new trial. *Colony Associates*, 60 N.C. App. at 636, 300 S.E.2d at 39. Plaintiffs sought to recover a good faith deposit of $11,000 made to Clapp's subagent, Global. Clapp forwarded the deposit to Global in order to obtain refinancing for plaintiffs and Global improperly refused to refund the deposit. *Id.* at 635-36, 300 S.E.2d at 38. One of plaintiffs' theories of recovery was that Clapp was liable for the improper actions of its subagent. We found that there was sufficient evidence from which the jury could find an

**SMITH v. CAROLINA COACH CO.**

[120 N.C. App. 106 (1995)]

agency relationship between plaintiffs and Clapp and held that Clapp, as agent for plaintiffs, could be responsible to plaintiffs for the acts of his subagent. *Id.* at 638-39, 300 S.E.2d at 40. In so holding, we cited with approval the Restatement (Second) of Agency § 406 (1957), which provides that "[u]nless otherwise agreed, an agent is responsible to the principal for the conduct of a . . . subagent with reference to the principal's affairs entrusted to the subagent . . . ." *Id.* at 639, 300 S.E.2d at 40.

In the case *sub judice*, the trial court instructed the jury in accordance with section 406 of the Restatement and defendant did not object to these instructions. Defendant contends that the uncontradicted evidence that Smith delegated his duties of selling tickets at the Washington and Greenville terminals to Freeman and that Freeman sold stolen tickets from these agencies established plaintiff's liability under section 406 of the Restatement of Agency as a matter of law. We disagree. On the one hand, evidence that plaintiff delegated his duties of selling tickets to Freeman and that Freeman could not have sold the stolen tickets without the use of the validator machines at plaintiff's terminals supports a conclusion that Freeman acted with reference to the principal's affairs. On the other hand, evidence which tended to show that plaintiff was only authorized to sell tickets which were entrusted and assigned to him suppports a conclusion that Freeman did not act with reference to the principal's affairs entrusted to him. We find that the issue of whether Freeman's actions constituted conduct with reference to the principal's affairs was controverted and was properly submitted to the jury.

[2] Defendant next argues that the trial court should have granted its motions for directed verdict and judgment notwithstanding the verdict on its breach of contract counterclaim because the uncontradicted evidence establishes that plaintiff breached paragraphs 3(b), (c), and (e) of the agreements, respectively, by failing (1) to report the sales of the 230 tickets, (2) to hold the proceeds of those tickets in trust and to deposit them in the bank, and (3) to indemnify defendant for the tickets that had been sold at the stations and had not been remitted to defendant. Defendant further argues that a directed verdict should have been granted for defendant on plaintiff's breach of contract claim because the uncontradicted evidence shows that defendant justifiably terminated the agencies pursuant to paragraph 5 of the agreements, which provides that the company may declare the agreements null and void if plaintiff fails to maintain records as directed by defendant or to account for and/or pay sums of money due.

## SMITH v. CAROLINA COACH CO.

[120 N.C. App. 106 (1995)]

Plaintiff contends that he complied with all the terms of the agreement. The facts surrounding the purported breach were undisputed and the contract language is unambiguous. Thus, we find that defendant failed to establish a breach of these provisions as a matter of law and we overrule defendant's assignments of error to the denial of its motions for directed verdict and judgment notwithstanding the verdict on defendant's breach of contract counterclaim and plaintiff's breach of contract claim.

Defendant presented no evidence that plaintiff ever received the proceeds of the sale of the stolen tickets or that plaintiff either knew or should have known about their sale. We do not construe paragraphs 3(b) and (c) as requiring plaintiff to prepare and submit reports for the sale of those tickets and to hold the proceeds of those tickets in trust for defendant under these circumstances. Moreover, we reject defendant's contention that it was entitled to reimbursement for its losses under paragraph 3(e), the indemnnity provision. Defendant cites *Lumberton v. Hood, Commissioner*, 204 N.C. 171, 167 S.E. 641 (1933) for support. In *Hood*, the court construed an agreement between defendant bank and plaintiff municipality whereby defendant agreed to post security bonds to the plaintiff to prevent damage to it in the event defendant wrongfully refused to release funds deposited by plaintiff and subject to its use. *Id.* at 172, 167 S.E. at 642. In holding that the indemnity agreement applied to plaintiff's own damage due to the defendant's conduct, the court noted that "indemnity signifies that which is given to a person to save him from suffering damage." *Id.* at 175, 167 S.E. at 644. We find *Hood* distinguishable. The primary purpose in construing a contract of indemnity is to ascertain and give effect to the intention of the parties. *Dixie Container Corp. v. Dale*, 273 N.C. 624, 627, 160 S.E.2d 708, 711 (1968). In *Dixie Container Corp.*, our Supreme Court held that an indemnitee could not recover for damage to its property caused by the indemnitor where the indemnity provision provided that "[indemnitor] shall indemnify and save harmless the . . . [plaintiff], and their principals against all loss, cost, including reasonable attorney's fees, or damages on account of injury to persons or property occurring in the performance of this contract and agreement." *Id.* at 625, 628, 160 S.E. at 709, 711. The Court stated that:

[w]e think it is reasonably clear that in the 'indemnify and save harmless' clause, defendant only bound itself to reimburse plaintiff for any damages it became obligated to pay third persons as a result of defendant's activity on the leased premises. Ordinarily,

SMITH v. CAROLINA COACH CO.

[120 N.C. App. 106 (1995)]

indemnity connotes liability for derivative fault. . . .' In indemnity contracts the engagement is to make good and save another harmless from loss on some obligation which he has incurred or is about to incur to a third party. . . .'

*Id.* at 628, 300 S.E.2d at 711 (citations omitted). The clear and express purpose of the agreement in *Hood* was to protect plaintiff from losing money on deposit with defendant in the event defendant wrongfully refused to return the deposit. In this case, as in *Dixie Container Corp.*, the indemnity provision was clearly intended to make good and save defendant harmless from loss or obligation which defendant incurs to a third party, not to protect defendant from loss of property directly caused by plaintiff or his employees. Thus, defendant could not recover for the loss occasioned by the sale of stolen tickets under the indemnity provision.

Defendant also argues that the court should have granted its motions for directed verdict and judgment notwithstanding the verdict on plaintiff's breach of contract claim because plaintiff presented insufficient evidence of damages. Defendant cannot assert this on appeal because it failed to raise this issue before the trial court on its motions for directed verdict and judgment notwithstanding the verdict. *See Broyhill v. Coppage*, 79 N.C. App. 221, 225, 339 S.E.2d 32, 36 (1986) (a motion for directed verdict must state the grounds therefor, N.C. Gen. Stat. § 1A-1, Rule 50(a), and grounds not asserted in the trial court may not be asserted on appeal).

[3] Finally, we address plaintiff's argument that the trial court erred in granting defendant's motion for directed verdict on his defamation claim. Plaintiff contends that he produced sufficient evidence to establish a prima facie case of defamation in the form of slander and libel. At trial, plaintiff argued that letters from defendant's counsel to plaintiff's counsel regarding plaintiff's contractual liability for the proceeds of the sale of the stolen tickets constituted libel and that statements made by defendant's division manager, Elvis Latiolais, on three separate occasions, constituted slander. We need not address the sufficiency of the evidence on the libel claim because plaintiff does not state any reason or argument nor does he cite any authority for support of his contention that there was sufficient evidence of libel and thus has abandoned his assignment of error with respect to the libel claim. *See* N.C. R. App. P. 28(b)(5) (1995). Nevertheless, we agree with defendant that the letters contained no defamatory statements and were privileged as communications relevant to proposed

judicial proceedings. *See Harris v. NCNB*, 85 N.C. App. 669, 674, 355 S.E.2d 838, 841 (1987).

Plaintiff presented evidence of three instances in which Latiolais allegedly accused him in the presence of others of stealing the tickets. Plaintiff argues that this evidence, when viewed in the light most favorable to him, is sufficient to establish a claim for slander per se. "To establish a claim for slander per se, a plaintiff must prove: (1) defendant spoke base or defamatory words which tended to prejudice him in his reputation, office, trade, business or means of livelihood or hold him up to disgrace, ridicule or contempt; (2) the statement was false; and (3) the statement was published or communicated to and understood by a third person." *West v. King's Dept. Store, Inc.*, 321 N.C. 698, 703, 365 S.E.2d 621, 624 (1988).

Plaintiff's evidence tended to show that on 29 April 1992, plaintiff met Latiolais at the Greenville station to discuss a problem they had with the tickets. Latiolais was there with Detective Edward Mayhue Haddock of the Greenville Police Department and David Nichols, defendant's auditor. Freeman was at the ticket counter selling tickets to a couple of customers. Plaintiff testified that as soon as he walked into the station, Latiolais loudly accused him of stealing the tickets and not reporting the sale of the tickets. Plaintiff and Latiolais were standing behind the ticket counter, approximately eight to ten feet away from Freeman, who was selling tickets to customers.

Detective Haddock and Nichols testified about what they heard on 29 April 1992. Haddock testified that he stood beside the counter with Nichols and Freeman and watched Nichols perform an audit of the Greenville station while plaintiff and Latiolais stood near the back door "at almost the opposite end of the counter and back in a corner, . . . where the back door is where the freight goes in and out, away from the counter area." Haddock heard voices, but could not recall any specific things that were said because his attention was drawn to a customer who came into the station and walked up beside him in front of Mr. Freeman and asked for a bus ticket. Freeman testified that he heard Latiolais "saying like you got employee [sic] working for you, and you don't know what they're doing or some stuff like that, and I heard him say like you got to pay the money for those tickets."

Several days later, plaintiff and his then fiancee, Linda Cox (Smith), returned to the Greenville station to pick up some papers. Latiolais had taken over the station and was operating it. Plaintiff testified that just as they reached the door, Latiolais asked him if he was

bringing him the money he had embezzled from the company. Linda Cox Smith testified that she and plaintiff stood at the customer side of the counter and waited for five to ten minutes for Latiolais to acknowledge them. There were customers in there at the time. No customers testified at trial. The evidence also showed that plaintiff had advised his fiancee that Latiolais had previously falsely accused him of stealing the tickets. Thus, we find that, as to Linda Cox Smith, the statements had no tendency to prejudice plaintiff in his reputation, office, trade, or business or hold him up to disgrace, ridicule or contempt and conclude that plaintiff failed to establish a claim for slander per se as to Mrs. Smith.·

Plaintiff recalled a third meeting with Latiolais in which Latiolais made defamatory remarks. However, he did not recall Mrs. Smith being present.

Plaintiff argues that the evidence was sufficient to create a jury issue as to whether the statements were published or communicated to and understood by a third person. Plaintiff mainly relies on *Harris v. Temple*, 99 N.C. App. 179, 182, 392 S.E.2d 752, 753, *review denied*, 327 N.C. 428, 395 S.E.2d 678 (1990), in which this Court held that evidence was sufficient to support a finding that slanderous statments were heard and understood by several people other than plaintiff. In *Harris*, plaintiff testified that she was standing a few feet away from defendant near the entry and exit doors of the grocery store when she heard defendant loudly accuse her of paying with a worthless check. She further testified that people were coming in and out of the store at the time, that a lady was standing immediately behind her, and that there were cashiers and bagboys at the checkout booths, the closest of which was ten feet away. *Harris*, 99 N.C. App. at 182-83, 392 S.E.2d at 753. The Court distinguished the case from *West v. King's Dept. Store, Inc.*, 321 N.C. 698, 365 S.E.2d 621 (1988), in which our Supreme Court held that plaintiffs' evidence of several other persons gathered in front of the store while defendant accused plaintiffs of not paying for merchandise was insufficient to create an issue for the jury as to whether other persons heard and understood the statements. *Id.* at 181-82, 392 S.E.2d at 753. In that case, the Court reasoned that because the proximity of the onlookers to the speaker was not clear, the evidence indicated only a possibility that someone might have heard the statements and that a possibility is not enough. *Id.*

In holding the evidence in *Harris* sufficient, the Court stated that evidence "that plaintiff heard slanderous remarks spoken in a loud

voice from a few feet away is some evidence that others a similar distance from the speaker also heard" and recited the evidence of the proximity of other persons to the speaker. *Id.* at 182, 392 S.E.2d at 753. The Court further noted that "[s]ince there is no evidence of any noises that might have drowned out [the speaker's] accusations, and the evidence is that he made them in a loud voice, it is inferable that they were heard well beyond a distance of 10 to 15 feet by those in the vicinity of the other checkout counters." *Id.* at 183, 392 S.E.2d at 754.

Although in this case, as in *Harris*, the evidence regarding the 29 April 1992 incident clearly indicates the proximity of other persons to Latiolais, we find *Harris* distinguishable. In this case, unlike *Harris*, the evidence shows that the plaintiff and the speaker had their backs turned away from everyone and that two of the individuals standing within eight feet of the speaker did not hear any defamatory remarks. Moreover, the evidence indicates that these individuals were distracted by a customer who was inquiring about ticket prices. Plaintiff's evidence of publication several days after the 29 April 1992 incident was insufficient because, as in *West v. King's Dept. Store*, the proximity of the customers to Latiolais is unclear and thus was not established. After carefully reviewing the record, we find no error in the trial court's failure to submit the defamation claim to the jury.

No error.

Judges COZORT and JOHN concur.